UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| IGOR ZBITNOFF, EILEEN ANDREOLI, JEFFREY FROST, RICHARD JOSEPH, JULIET BETH BUCK, RAY GONDA, and STOP THE F-35 COALITION,<br><br>    Plaintiffs,<br><br>v.<br><br>DEBORAH LEE JAMES, SECRETARY OF THE AIR FORCE,<br><br>    Defendant. | Case No. 5:14-cv-132 |

**OPINION AND ORDER RE:
PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD AND
CONSIDER EXTRA-RECORD EVIDENCE**
(Doc. 26)

This case arises from the decision by the Secretary of the United States Air Force to select the Vermont Air National Guard to operate F-35A aircraft at the Burlington International Airport. Plaintiffs challenge the Air Force's decision-making process under the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and the Administrative Procedure Act ("APA") in a nine-count second amended complaint. Two counts allege that the Air Force violated the NEPA and APA by failing to consider certain negative environmental impacts in its final environmental impact statement ("EIS") and failing to issue a supplemental EIS addressing the concerns. Plaintiffs move the court to consider extra-record evidence in its review of the Air Force's decisions. For the reasons stated below, plaintiffs' motion for consideration of extra-record evidence is DENIED.

    **I.    Background**

In December 2009, the Air Force began "scoping" for potential operational base locations for deployment of the F-35A aircraft. (AR 10510.) The F-35A "is the next-generation, multi-role fighter aircraft" which replaces the Air Force's F-16 and A-10 models. (AR 10503.) The F-

1

35A is made in large part from composite materials in place of the aluminum skin used in earlier generation aircraft such as the F-16. (AR 64280, 64449.) The exterior includes low observable materials which form the radar-absorbent "stealth" coating, which is applied like a paint. (AR 10506.) In March 2012, the Air Force issued a draft EIS identifying and evaluating six Air Force and Air National Guard bases which might be appropriate locations to station F-35A aircraft. (Doc. 25 at 10.) Included among the potential bases was the Burlington Air Guard Station at Burlington International Airport. The Vermont Air National Guard currently operates F-16 jets at the Burlington Air Guard Station. Release of the draft EIS was followed by a public comment period between April and June 2012. (AR 10511.)

In March 2013, the Air Force issued a revised draft EIS which incorporated comments from the public. (AR 10511.) After a second round of public comments, the Air Force issued the final EIS in September 2013. (AR 10440-11381.) The final EIS is a 942-page document which analyzes and evaluates the environmental impact of deployment of the F-35As at the six locations: Burlington Air Guard Station, Hill Air Force Base, Jacksonville Air Guard Station, McEntire Joint National Guard Base, Mountain Home Air Force Base, and Shaw Air Force Base. Such impacts include noise levels, air emissions, and effects on land use near the bases. (AR 10459.)

After the close of the revised EIS comment period, plaintiffs learned of certain environmental hazards associated with F-35A crashes. (Doc. 25 at 34.) On October 17, 2013, plaintiffs submitted through their attorney a letter to the Air Force raising issues about the final EIS's alleged failure to disclose the dangers posed by the burning of composite and low observable materials—primarily, the release of toxic gases—in the event of an F-35A crash. (AR 63748-50.) Plaintiffs requested the issuance of a supplemental EIS and a reopened comment period on the supplemental EIS. (*Id.*)

On November 21, 2013, the Air Force issued a Memorandum for Record announcing its decision not to issue a supplemental EIS. (AR 65351.) On December 2, 2013, the Air Force announced its decision to base eighteen F-35A aircraft at the Burlington Air Guard Station. (AR 12881-88.) The Air Force also issued a decision to base seventy-two F-35A aircraft at Hill Air Force Base in Utah. (AR 12874-80.)

Plaintiffs filed suit challenging the Air Force's decision-making on June 30, 2014. (Doc. 1.) Count 6 of the second amended complaint alleges that the Secretary of the Air Force violated NEPA by "failing to adequately disclose and evaluate the potentially catastrophic impacts that may result from basing F-35 jets in an urban area, failing to issue a supplemental [draft] EIS disclosing and evaluating this potential, and failing to explain why she had chosen not to do so." (Doc. 25 at 35-36.) Plaintiffs allege in count 9 that the same behavior violated the APA in addition to the NEPA.[1]

Plaintiffs request that the court consider the affidavit of their proposed expert, Pierre Sprey, in reviewing the Air Force's decision not to issue a supplemental EIS. (Doc. 26-2.) Sprey holds a Bachelor's degree in mechanical engineering and a M.E. degree in operations research and mathematical statistics. (Doc. 26-3 at 1.) Sprey previously worked as Special Assistant to the Assistant Secretary of Defense for System Analysis. (Doc. 26-2 at 1.) In that role, he helped develop the "concept design and specifications for the F-16 aircraft" and served as "Technical Leader of the concept design team for the A-10 aircraft." (*Id.*) He currently works as a consultant in certain kinds of environmental impact analysis and military reform. (Doc. 26-3 at 1.) Sprey's nine-page affidavit discusses the impacts of an F-35A crash on the human population surrounding the crash site, including the release of toxic fumes, the duration of a fire, and the potential lack of equipment, training and manpower on the part of first responders to effectively contain the hazards. (Doc. 26-2.)

## II.     Standard of Review

The National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, was enacted to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA accomplishes this goal by focusing public attention on proposed agency action to "ensure[] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989). NEPA requires agencies to prepare an EIS when

---

[1] Plaintiffs explain that count 6 was drafted before the administrative record became available and count 9 was added after the administrative record was produced and revealed that the Air Force internally confirmed that the environmental impacts identified in plaintiffs' October 17, 2013 letter had not been disclosed. (Doc. 26 at 6 n.4.)

proposing "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must address adverse environmental effects of the proposed action; alternatives to the proposed action; "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and "any irreversible and irretrievable commitments of resources" the proposed action would entail. 42 U.S.C. § 4332. An EIS is prepared in two stages: "a draft EIS . . . is circulated for public comment, and a final EIS that responds to those comments" is issued. *Senville v. Peters*, 327 F. Supp. 2d 335, 343 (D. Vt. 2004) (citing 40 C.F.R. § 1502.9). An agency must prepare a supplemental EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Review of an agency's decision not to issue a supplemental EIS is governed by the "arbitrary and capricious" standard of the APA. 5 U.S.C. § 706(2)(A); *Marsh*, 490 U.S. at 375-76. The court undertakes a two-step inquiry. "First, the court must ask whether the agency took a 'hard look' at the possible effects of the proposed action." *Vill. of Grand View v. Skinner*, 947 F.2d 651, 657 (2d Cir. 1991) (quoting *Marsh*, 490 U.S. at 373-74). "Second, if such a 'hard look' has been taken, the court must ask whether the agency's decision was arbitrary or capricious." *Id.* This inquiry requires consideration of whether the agency articulates a satisfactory explanation for its decision based upon a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

In conducting the "arbitrary and capricious" inquiry, the court must be mindful that an agency has "discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378. Nonetheless, "courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Id.*

In reviewing an agency decision pursuant to the APA, the court is normally limited to consideration of the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). There are, however, exceptions to the so-called "record rule," such as "when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of an agency or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice." *Pogliani v. U.S. Army Corps of Eng'rs*, No. 1:01-CV-0951, 2007 WL 983549, at *9 (N.D.N.Y. Mar. 28, 2007). In the NEPA context, a court may consider extra-record evidence "to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 15 (2d Cir. 1997). "Courts may conduct plenary review, and consider additional information obtained from the parties through affidavits or testimony, only when the administrative record is so inadequate as to prevent the reviewing court from effectively determining whether the agency considered all environmental consequences of its proposed action." *Id.* at 15.

Here, plaintiffs move the court to consider Sprey's affidavit in reviewing the Air Force's decision not to issue a supplemental EIS.[2] (Doc. 26 at 4.) Therefore, under the standards articulated above, the court must determine whether the administrative record is so inadequate as to prevent it from determining whether the Air Force's decision not to issue a supplemental EIS was arbitrary or capricious.

### III.   Analysis

Plaintiffs argue that the Air Force should have prepared a supplemental EIS addressing the environmental impacts of an F-35A crash, an event they recognize is unlikely but which is nonetheless within the limits of what is foreseeable. The principal environmental concerns raised by plaintiffs arise from the materials of which the F-35A is composed. "The F-35 exterior is almost entirely composite material, mostly graphite and some small amounts of Kevlar and fiberglass. Composite materials consist of epoxy or bismaleimide resins encapsulating the fiber

---

[2] The court construes plaintiffs' motion as requesting consideration of extra-record evidence rather than supplementation of the administrative record, which the court is not empowered to do. *Nat'l Audubon Soc.*, 132 F.3d at 15-16.

5

. . . ." (AR 64453.) The F-35A is coated with advanced stealth, or "low observable," material, about which little is publicly known because the information about its makeup is classified. (AR 63819, 64280.)

Sprey's affidavit addresses plaintiffs' concerns in detail. He notes that burning composite materials "releases toxic fumes from the resins, and releases microscopic fibers that may be inhaled." (Doc. 26-2 at 3.) Low observable materials "add additional toxic risks." (*Id.* at 4.) Sprey provides an analogy to the toxicity of released chlorine, and concludes that first responders would need to protect people downwind as far away as ten miles during the day and forty miles at night. (*Id.* at 5-7.) Because "[t]he composite materials themselves become fuel for aircraft fires upon crashing[,] [t]he duration of the composite aircraft fire will be substantially longer than for aluminum or mostly aluminum aircraft." (*Id.* at 4.) He observes that the F-35A contains "about 5-6000 pounds of composite structure plus low observable skin," compared to the F-16 which contains "approximately 200 pounds of composite materials." (*Id.* at 3-4.) Sprey cites a 2008 B-2 crash in Guam whose "fire smoldered on for two to three days, continuing to consume the composite materials and continuing to release toxic fumes." (*Id.*) (The B-2, according to Sprey, contains about 25,000 pounds of composites.) The toxicity and duration of the fire caused by the F-35A's composite materials—plus the unknown toxicity of the F-35A's low observable materials—drive Sprey's concerns about the human health consequences of a crash and for what he believes is the questionable ability of first responders to cope with an F-35A crash using current equipment and training. (*Id.* at 4, 8.) Sprey expresses his disagreement with the Memorandum for Record and with the Air Force's conclusion "that the dangers that would arise from the crash of an F-35 are not new, and that firefighters already have access to the training and equipment they would need to respond to these dangers." (*Id.* at 2, 7.)

Sprey's affidavit is unnecessary to the court's consideration, however, because the administrative record already contains documents addressing the concerns it raises. A September 2013 paper co-authored by Sprey and South Burlington City Councilor Rosanne Greco observes that composite materials burn slowly, layer by layer, so the fire from an F-35A crash would last significantly longer than a fire from more traditional materials such as

6

aluminum. (Doc. 26-5 at 1.)[3] The paper argues that the toxic gases released from the burning of composite materials "can be carried for miles by the wind." (*Id.* at 2.) It raises the specific concern about the added toxicity from the stealth coating, stating that such "stealth coatings are known to add significantly to the toxic hazards of ordinary composites" and citing a 1980s-era F-117 crash whose burning gases killed two people and injured five. (*Id.* at 3.) The paper also cites to the Air Force's Impact Analysis of the 2008 B-2 crash in Guam, and expresses concern about the final EIS's failure to discuss first responder training, given the duration of the fire and the toxicity of the burning gases. (*Id.* at 2-3.) The record contains a letter submitted by plaintiffs' lawyer and an email submitted by Greco addressing similar concerns. (AR 63748-50, AR 62583.)

The Air Force's response to plaintiffs' identification of F-35A crash hazards is also documented in the record. Internal emails document requests for information from agency experts and from studies to determine the toxicity of the F-35A's components as well as discussions concerning first responders' ability to respond to crash and fire incidents involving composite materials. (*E.g.*, AR 62957-61, AR 64280-83, AR 64321-22, AR 64439.) The record includes a document addressing potential hazards—including release of toxic substances—of aircraft crashes as well as a document introducing the Hazardous Aerospace Material Mishap Emergency Response (HAMMER) program, which addresses "safety and health issues related to aerospace vehicle mishap response, investigation, recovery, clean-up and disposal." (AR 43671-75, AR 43658.) Also in the record is the Air Force's question-by-question response to the October 2013 letter submitted by plaintiffs' attorney. (AR 64449-53, AR 65427-31.) The record contains agency emails documenting the formation of the Air Force's opinion, memorialized in the Memorandum for Record, that F-35A crash hazards do not constitute significant new circumstances or information necessitating a supplemental EIS. (AR 64454-55, AR 65351, AR 65402-06, AR 65432-33, AR 65505-07.)

---

[3] R. Greco & P. Sprey, *Burlington Runway Length Increases F-35A Crash Potential: Composition of F-35A Increases Crash Danger* (Sept. 2013). This document was inadvertently omitted from the administrative record originally produced but both parties agree that it was submitted to the Air Force after release of the revised draft EIS and is currently part of the record. (Doc. 30 at 10 n.6.)

The administrative record therefore already contains sufficient material for the court to review the Air Force's decision not to supplement the final EIS based on plaintiffs' concerns. At the hearing on August 24, 2015, plaintiffs' attorney argued that—unlike the paper authored by Greco and Sprey already in the record—Sprey's affidavit includes a calculation of risk and also states that the placement of stealth aircraft in a heavily populated location would be unprecedented. However, the Greco/Sprey paper explicitly addresses risk posed by stealth coatings to the population surrounding the Burlington International Airport. Sprey's affidavit offers no new information crucial to the court's review and thus should not be considered in addition to the record evidence. *See Vermonters for a Clean Env't, Inc. v. Madrid*, No. 1:12-cv-73-jgm, 2012 WL 3962754, at *2-3 (D. Vt. Sept. 11, 2012) (declining to consider extra-record evidence in reviewing whether Forest Service considered noise issue where "the agency considered the effect noise from the project would have on the surrounding area and . . . sought additional information in response to comments concerning noise"); *Tarbell v. Dep't of Interior*, 307 F. Supp. 2d 409, 422 (N.D.N.Y. 2004) (excluding extra-record declaration after finding "no compelling reason ha[d] been offered to accept extrinsic evidence which was not before the [agency] at the time of the determinations at issue in th[e] case"); *see also Brodsky v. U.S. Nuclear Regulatory Comm'n*, No. 09 Civ. 10594 (LAP), 2015 WL 1623824, at *7 (S.D.N.Y. Feb. 26, 2015) (declining to consider extra-record evidence that agency had determined was irrelevant); *cf. Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 515 (D. Vt. 2002) (agreeing to consider extra-record letter addressing dioxin contamination in Lake Champlain which "raise[d] issues not explicitly addressed" in administrative record).

Plaintiffs contend that Sprey's affidavit is nonetheless necessary for the court to fully understand the technical aspects of the final EIS's omissions. (Doc. 26 at 6.) Granted, Sprey's affidavit—although partisan in its orientation—is a detailed and comprehensive compilation of the potential dangers posed by an F-35A crash. However, the court does not find the record so deficient in technical treatment of plaintiffs' crash-related concerns that it cannot adequately conduct its review of the Air Force's decision-making process. *See Ga. River Network v. U.S. Army Corps of Eng'rs*, No. 4:10-cv-267, 2011 WL 2551044, at *3-4 (S.D. Ga. June 27, 2011) (rejecting argument that court should consider extra-record evidence because agency failed "to explain in the Record the technical and complex aspects of its decision"). Consideration of Sprey's affidavit would almost certainly draw the court into a judgment about the scientific

8

merits of plaintiffs' objections to the basing decision. *See Nat. Res. Def. Council v. F.A.A.*, 564 F.3d 549, 561 (2d Cir. 2009) (noting that court's "role is not to resolve scientific disputes"); *see also Ga. River Network*, 2011 WL 2551044, at *3 ("Plaintiffs' proffered extra-record evidence is an expert's testimony attacking the expert report relied upon by the Corps. This is not the sort of evidence the Court might need to understand this subject matter, this is an attempt to commence a battle of the experts after the record has been closed." (internal citation omitted)).

In their reply memorandum, plaintiffs argue that the court must consider Sprey's affidavit because its substance is nowhere addressed in the final EIS. (Doc. 36.) Plaintiffs misstate the standard for consideration of extra-record evidence. The court must determine whether "the *administrative record* is so inadequate as to prevent the reviewing court from effectively determining whether the agency" should have prepared a supplemental EIS and not whether the final EIS alone is so inadequate. *Nat'l Audubon Soc.*, 132 F.3d at 15 (emphasis added). Plaintiffs' version of the legal standard would allow for the consideration of additional evidence even where the administrative record already contains reports and other materials addressing the same issues as the proposed extra-record evidence. But courts must look at the whole record, which "often contain[s] sufficient information to permit the court to [determine whether the agency considered all environmental consequences of its proposed action], thereby obviating the need for considering extra-record evidence." *Id.*

The court notes that the determination not to consider plaintiffs' proffered extra-record evidence has little effect on the ultimate issue of whether the Air Force must prepare a supplemental EIS. "Plaintiffs are free to argue to the court in the briefing to come that" the record evidence shows that the Air Force's decision not to prepare a supplemental EIS was arbitrary or capricious. *Vermonters for a Clean Env't, Inc.*, 2012 WL 3962754, at *3.

## IV. Conclusion

For the reasons stated above, plaintiffs' motion for consideration of extra-record evidence in DENIED.

Dated at Rutland, in the District of Vermont, this 1st day of September, 2015.

_____
Geoffrey W. Crawford, Judge
United States District Court