# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

Igor Zbitnoff, Eileen Andreoli, Jeffrey Frost,      )
Richard Joseph, Juliet Beth Buck, Ray Gonda,        )
And Stop the F-35 Coalition,                        )
                                                    )
      Plaintiffs,                                )
                                                    )
City of Winooski,                                   )
                                                    )
      Intervenor-Plaintiff,                      )
                                                    )
      v.                                         )    Civil Action No. 5:14-cv-132
                                                    )
Deborah Lee James, Secretary of the Air Force,      )
                                                    )
      Defendant.                                 )

---

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR JUDGMENT ON THE RECORD

# TABLE OF CONTENTS

*Introduction*................................................................................................1

I.    THE NEED TO BEDDOWN THE F-35A .................................................2

II.   THE NEPA PROCESS.........................................................................2

III.  PLAINTIFFS' CLAIMS .....................................................................6

*Argument* ................................................................................................9

I.    STANDARD OF REVIEW ..................................................................9

     A.     Review Under the APA is Both Limited and Deferential ......................9

     B.     The Scope of Review in a NEPA Case is Narrow and Requires Application of the Rule of Reason .......................................................10

     C.     Judgment on the Record in Favor of the Air Force is Appropriate ......12

II.   THE AIR FORCE'S DISCUSSION OF POSSIBLE MITIGATION PROVIDED SUFFICIENT DETAIL TO ENSURE FAIR EVALUATION OF THE ENVIRONMENTAL  CONSEQUENCES OF BASING THE F-35A.  [COUNTS  ONE AND THREE] ....................................................13

     A.     The Air Force Provided a Reasonably Complete Discussion of Mitigation Measures With Sufficient Detail to Ensure Environmental Consequences Have Been Fairly Evaluated...............16

          1.    Mitigation measures need not be evaluated in the same level of detail as reasonable alternatives ..........................................17

          2.    The Air Force was not required to assess the cost of potential mitigation measures ..................................................................17

          3.    The Air Force's discussion of mitigation was reasonably complete and allowed a fair evaluation of the environmental consequences of the proposed action and alternatives............18

     B.     The Air Force Had No Obligation to Discuss the Environmental Consequences That Might Result Should Homes in Winooski be Purchased and Razed ........................................................................22

     C.     The Air Force Reasonably and Adequately Responded to Comments.. ...........................................................................................24

III.    THE AIR FORCE'S DISCUSSION OF LOCAL LAND USE
REASONABLY ILLUSTRATED POSSIBLE CONFLICTS BETWEEN
BASING THE F-35A AND  THE OBJECTIVES OF LOCAL LAND USE
LAWS AND PLANS [COUNT TWO] ..........................................................27

    A.    40 C.F.R. § 1506.2(d) is Inapplicable Because There Is No
Inconsistency Between the Air Force's Actions and the Local Laws
and Plans Cited by Plaintiffs ................................................................30

    B.    The Air Force Complied With 40 C.F.R. § 1502.16(c) Because it
Reasonably Informed the Public and Decision-makers of Any
Possible Conflict Between the Proposed Action and the Objectives
of the South Burlington Comprehensive Plan and Vermont's Act
250 ..........................................................................................................34

    C.    The Air Force Reasonably and Adequately Explained How it Would
Reconcile Basing the F-35A at Burlington With Any Possible
Inconsistency With Local Land Use Plans and Laws ..........................36

IV.    THE AIR FORCE ADEQUATELY AND REASONABLY CONSIDERED
IMPACTS ON HISTORIC PROPERTIES [COUNT FOUR] ........................37

    A.    The Air Force Properly Discussed Historic Properties ......................38

        1.    NEPA Does Not Require Evaluation of Impacts on the Use
of Historic Properties ................................................................41

        2.    The Air Force Properly Focused its Analysis on the
Characteristics Which Enabled the Properties to be Listed in
the National Register ..................................................................43

        3.    In Any Event, the Air Force Did Assess the Impact on
Residential Use of Historic Properties .....................................43

        4.    The Air Force was not obligated to individually identify
historic properties .....................................................................44

        5.    The Air Force was not obligated to consider the impact of
historic properties being purchased and demolished ...............46

V.    "NO MILITARY AIRCRAFT" AT BURLINGTON AGS IS NEITHER
THE  PROPER NO ACTION ALTERNATIVE, NOR A REASONABLE
ALTERNATIVE  [COUNT FIVE] ................................................................46

    A.    Plaintiffs' Speculation that the Air Force Expected the Potential
Retirement of the F-16s to Result in No Military Aircraft Being
Stationed at Burlington is Baseless ......................................................47

B.    The Air Force Properly Identified the No Action Alternative as Continuation of the Present Operations ................................................48

C.    No Military Aircraft at Burlington Was Not a Reasonable Alternative...........................................................................……..51

VI.    THE AIR FORCE ADEQUATELY AND REASONABLY ADDRESSED AIRCRAFT SAFETY AND PROPERLY CONCLUDED AN SEIS WAS NOT NECESSARY [COUNTS SIX AND NINE] ........................................52

A.    The Air Force Took a Hard Look at Whether Supplementing the FEIS Was Necessary and Its Decision not to Supplement the EIS Was Not Arbitrary or Capricious ........................................................56

B.    The Air Force Had the Information Necessary to Assess the Potential Risks of the Composite and Stealth Materials in the   F-35A...........................................................................................62

C.    The Air Force Properly Relied on an Internal Analysis to Respond to Plaintiffs' Request for a SEIS ............................................................63

D.    The Possibility of a National Defense Area Being Declared for an F-35A Crash Does Not Require an SEIS.................................................64

VII.    THE AIR FORCE PROPERLY DISCLOSED THE FACTORS, INCLUDING  COST, THAT WOULD BE USED IN ITS DECISION-MAKING [COUNT TEN] ................................................................65

A.    The Air Force Complied with 40 C.F.R. § 1502.14 ............................68

B.    The Air Force Complied With 40 C.F.R. § 1502.23 Because the FEIS  Allowed for Fair Consideration of the Adverse Environmental Effects of Basing the F-35A at Burlington ..........................................69

Conclusion ......................................................................................................73

# TABLE OF AUTHORITIES

**Federal Cases**

*Abenaki Nation of Mississquoi v. Hughes*
  805 F. Supp. 234 (D. Vt. 1992) ................................................................. 20, 38

*Airport Impact Relief, Inc. v. Wykle*
  192 F.3d 197 (1st Cir. 1999) ............................................................................. 22

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*
  524 F. Supp. 642 (D. Md. 2007) ............................................................... 7, 32, 33

*Balt. Gas & Elec. Co. v. NRDC*
  462 U.S. 87 (1983) ..................................................................................... 10, 22

*Biodiversity Conservation All. v. U.S. Forest Serv.*
  765 F.3d 1264 (10th Cir. 2014) ......................................................................... 48

*Bloch v. Powell*
  227 F. Supp. 2d 25 (D.D.C.  2002) .................................................................... 13

*Brodsky v.  Nuclear Reg. Comm'n*
  704 F.3d 113 (2d Cir. 2013) ........................................................................... 9, 10

*Cellular Phone Taskforce v. FCC*
  205 F.3d 82 (2d Cir. 2000) ............................................................................... 10

*Chelsea Neighborhood Ass'n. v. U.S. Postal Serv.*
  389 F. Supp. 1171 (S.D.N.Y., 1975) .................................................................. 17

*Citizens Against Burlington, Inc. v. Busey*
  938 F.2d 190 (D.C. Cir. 1991) .......................................................................... 52

*Citizens to Pres. Overton Park, Inc. v. Volpe*
  401 U.S. 402 (1971) ....................................................................................... 9, 10

*City of Angoon v. Hodel*
  803 F.2d 1016 (9th Cir. 1986) .......................................................................... 52

*Coal. on Sensible Transp., Inc. v. Dole*
  826 F.2d 60 (D.C. Cir. 1987) ............................................................................. 11

*Communities, Inc. v. Busey*
  956 F.2d 619 (6th Cir. 1992) ............................................................................ 43

*Conservation Nw. v. Rey*
    674 F. Supp. 2d 1232 (W.D. Wash. 2009) .............................................................. 49

*Ctr. for Biological Diversity v. U.S. Dep't. of Interior*
    623 F.3d 633 (9th Cir. 2010) ............................................................................... 49

*Cty. of Suffolk v. Sec'y of the Interior*
    562 F.2d 1368 (2d Cir. 1977) ............................................................. 11, 21, 45, 73

*Custer Cty. Action Ass'n v. Garvey*
    256 F.3d 1024 (10th Cir. 2001) ........................................................................... 49

*Dep't. of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ..................................................... 6, 10, 11, 12, 31, 63

*Envtl. Def. Fund, Inc. v. Hoffman*
    566 F.2d 1060 (8th Cir. 1977) ............................................................................. 20

*Envtl. Def. v. U.S. EPA*
    369 F.3d 193 (2d Cir. 2004) ................................................................................ 60

*Fuel Safe Wash. v. FERC*
    389 F.3d 1313 (10th Cir. 2004) ........................................................................... 44

*Fund for Animals v. Kempthorne*
    538 F.3d 124 (2d Cir. 2008) ......................................................................... 10, 45

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*
    857 F.2d 505 (9th Cir. 1988) .............................................................................. 44

*Headwaters, Inc. v. Bureau of Land Mgmt.*
    914 F.2d 1174 (9th Cir. 1990) ............................................................................ 20

*Islander E. Pipeline Co. v. McCarthy*
    525 F.3d 141 (2d Cir.2008) ................................................................................ 10

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*
    42 F.3d 517 (9th Cir.1994) ................................................................................. 63

*Marsh v. Or. Nat. Res. Council*
    490 U.S. 360 (1989) ................................................... 8, 13, 56, 57, 60, 63

*Martin v. Fed. Energy Regulatory Comm'n*
    199 F.3d 1370 (D.C. Cir. 2000) .......................................................................... 31

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page v**

*Mayo Found. v. Surface Transp. Bd.*
  472 F.3d 545 (8th Cir. 2006) ........................................................................... 51

*Md-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*
  487 F.2d 1029 (D.C. Cir. 1973) ....................................................................... 32

*Muller v. First Unum Life Ins. Co.*
  341 F.3d 119 (2d Cir. 2003) ............................................................................ 13

*N. Idaho Cmty. Action Network v. U. S. Dep't of Transp.*
  545 F.3d 1147 (9th Cir. 2008) ................................................................... 41, 42

*N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*
  151 F. Supp. 2d 661 (M.D.N.C. 2001) ....................................................... 70, 71

*Nat. Res. Def. Council (NRDC) v. Callaway*
  524 F.2d 79 (2d Cir. 1975) ......................................................................6, 11, 12

*Nat'l Audubon Soc'y v. Dep't of Navy*
  422 F.3d 174 (4th Cir. 2005) ........................................................................... 27

*Norton v. S. Utah Wilderness All.*
  542 U.S. 55 (2004) ............................................................................................ 9

*NRDC v. FAA*
  564 F.3d 549 (2d Cir. 2009) ...........................................................11, 51, 52, 56, 60

*NRDC v. U.S. Dep't of Agric.*
  613 F.3d 76 (2d Cir. 2010) .............................................................................. 10

*Nw. Coal. for Alternatives to Pesticides v. Lyng*
  844 F.2d 588 (9th Cir. 1988) ........................................................................... 51

*Physicians Comm. for Responsible Med. v. Johnson*
  436 F.3d 326 (2d Cir. 2006) ............................................................................ 13

*Robertson v. Methow Valley Citizens Council*
  490 U.S. 332 (1989) ................................................. 6, 7, 14, 16, 17, 20, 21

*S. La. Envtl. Council, Inc. v. Sand*
  629 F.2d 1005 (5th Cir. 1980) ......................................................................... 70

*S. Utah Wilderness All. v. Norton*
  326 F. Supp. 2d 102 (D.D.C. 2004) ................................................................. 44

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND
IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page vi**

*Se. Alaska Conservation Council v. Fed. Highway Admin.*
   649 F.3d 1050 (9th Cir. 2011) ............................................................................ 51

*Senville v. Peters*
   327 F. Supp. 2d 335 (D. Vt. 2004) ............................................................ 12, 13, 51

*Sierra Club v. Sigler*
   695 F.2d 957 (5th Cir. 1983) ............................................................................ 70

*Sierra Club v. U.S. Army Corps of Eng'rs*
   701 F.2d 1011 (2d Cir. 1983)..........................................................................6, 11

*Theodore Roosevelt Conservation Partnership v. Salazar*
   661 F.3d 66 (D.C. Cir. 2011) ..................................................................... 6, 12, 44

*Theodore Roosevelt Conservation P'ship v. Salazar,*
   616 F.3d 497 (D.C. Cir. 2010) ............................................................................ 16

*Tinicum Twp., Pa. v. U.S. Dep't of Transp.*
   685 F.3d 288 (3d Cir. 2012) ............................................................................ 12

*Town of Grapevine v. U.S. Dep't of Transp.*
   17 F.3d 1502 (D.C. Cir. 1994) ............................................................................ 42

*Town of Huntington v. Marsh*
   859 F.2d 1134 (2d Cir. 1988)............................................................................ 12

*Utahns for Better Transp. v. U.S. Dep't of Transp.*
   305 F.3d 1152 (10th Cir. 2002)............................................................................ 33

*Vermonters for a Clean Env't, Inc. v. Madrid*
   73 F. Supp. 3d 417 (D. Vt. 2014) ................................................................ 9, 12, 63

*Vill. of Grand View v. Skinner*
   947 F.2d 651 (2d Cir. 1991) ..................................................................... 23, 24, 56

*Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.*
   247 F. Supp. 2d 495 (D. Vt. 2002) ........................................................ 7, 10, 14, 18

*Webster v. U.S. Dep't of Agric.*
   685 F.3d 411 (4th Cir. 2012)...................................................................... 69, 70

*Wilson v. Omaha Tribe*
   442 U.S. 653 (1979) ............................................................................ 31

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND
IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page vii**

*Wyoming v. U.S. Dep't of Agric.*
  661 F.3d 1209 (10th Cir. 2011) ................................................ 51

**State Cases**

*In re Req. for Jurisdictional Op.*
  2015 VT 41, 117 A.3d 457 ........................................ 1, 30, 31

**Federal Statutes**

50 U.S.C. § 797 ..................................................................... 69

Administrative Procedures Act, 5 U.S.C. §§ 701-06 ................... 10

Department of Transportation Act, 49 U.S.C. § 303(c) ............... 46

National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h ........... 1

National Historic Preservation Act, 54 U.S.C. § 300101-300321 ............. 45

**Federal Regulations**

14 C.F.R. § 150.23 ........................................................ 19, 24

14 C.F.R. § 150.35 .............................................................. 19

36 C.F.R. § 800.2 ............................................................... 38

36 C.F.R. § 800.5 ............................................................... 43

36 C.F.R. § 800.8 ............................................................... 38

40 C.F.R. § 1502.14 ............................................ 17, 48, 51, 66, 69

40 C.F.R. § 1502.16 ............................................ 17, 27, 28, 29, 34

40 C.F.R. § 1502.23 ......................................................... 66, 70

40 C.F.R. § 1503.3 ............................................................... 17

40 C.F.R. § 1504.3 ............................................................... 17

40 C.F.R. § 1506.2 ...................................................... 27, 28, 33

40 C.F.R. § 1508.25 .............................................................. 17

46 Fed. Reg. 18026 .............................................................. 20

*Envtl. Impact Analysis Process,* 64 Fed. Reg. 38,127, 38,127-28 (July 15, 1999) ................. 49, 50

**State Statutes**

Vt. Stat. Ann. 10 § 6001(14)(A)(2015) ........................................................................... 31

Vt. Stat. Ann. 10 § 6081(a) (2015) ................................................................................. 30

*Introduction*

This case represents one segment of Plaintiffs'[1] multi-faceted challenge to the bedding down of the F-35A Lightning II ("F-35A") at Burlington Air Guard Station ("AGS").[2] In this lawsuit, Plaintiffs challenge the Air Force's environmental analysis through eight counts brought pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h ("NEPA").[3] *See* Plaintiffs' Memorandum In Support of Plaintiffs' Motion for Summary Judgment or Judgment on the Record (Dkt. No. 47).

Contrary to Plaintiffs' suggestions, the Air Force compiled an Environmental Impact Statement ("EIS") and supporting record that thoroughly assessed the environmental impacts of bedding down the F-35A, allowed the Air Force to make a reasoned decision to base the F-35A at Burlington AGS, and otherwise met all the requirements of NEPA. Plaintiffs' contentions that the Air Force should have provided additional or more detailed analysis should be rejected because the information sought by Plaintiffs would not have meaningfully added to the Air Force's and the public's ability to evaluate the environmental consequences of the Air Force's decision. Plaintiffs' other claims cannot succeed because they either rest on unwarranted assumptions, contravene governing legal standards, or both. Because Plaintiffs have failed to

---

[1]     In this memorandum, "Plaintiffs" is used to refer to the Plaintiffs identified in the Second Amended Complaint. *See* Dkt. No. 25. Intervenor-Plaintiff City of Winooski is specifically identified as Plaintiff City of Winooski. *See* Dkt. No. 24.

[2]     Plaintiffs previously unsuccessfully brought litigation related to the F-35A in this District (D. Vt. 5-13-0073), as well as in Vermont state courts. *See In re Req. for Jurisdictional Op. re Changes in Physical Structures & Use at Burlington Int'l Airport for F-35A*, 2015 VT 41, 117 A.3d 457, *cert. denied, Joseph v. City of Burlington*, 136 S.Ct. 480 (2015).

[3]     Plaintiffs' Second Amended Complaint also includes an additional NEPA count (Count 7) and a claim pursuant to the National Historic Preservation Act (Count 8), but Plaintiffs' Motion for Summary Judgment or Judgment on the Record abandons those claims. Dkt. No. 42 at 1.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 1**

demonstrate that the Air Force's decision was "arbitrary and capricious," Defendant is entitled to judgment on the record as a matter of law in this NEPA case.

## I.    THE NEED TO BEDDOWN THE F-35A.

In 1994, Congress and the Department of Defense determined that the Air Force needed a next generation, multi-role fighter aircraft to replace the ageing F-16 and A-10 aircraft. AR10504 (FEIS 1-2).   Since then, the F-35A program has passed through the systems development and demonstration phase, and training bases have been established at Luke and Eglin Air Force Bases.  The Air Force now needs to beddown operational aircraft.  AR10506 (FEIS 1-4).  The beddown and operation of the F-35A is a major step toward maintaining "combat capability and mission readiness" for the Air Force.  AR10508 (FEIS 1-6).

To identify potential bases for the F-35A, the Air Force started with over two hundred potential locations and winnowed that list down by applying four general criteria: mission, capacity, environmental, and cost.  *See* AR10541 (FEIS 2-25); AR12864 (FEIS E-1233).  Those criteria were by no means weighted equally.  Instead, mission criteria were the paramount concern as the Air Force identified three finalist Air National Guard (ANG) bases: Burlington AGS, Jacksonville AGS in Florida and McEntire Joint National Guard Base in South Carolina.  *See* AR10546 (FEIS 2-30).

## II.    THE NEPA PROCESS.

Having identified the candidate bases, the Air Force began the NEPA process, the means by which it would evaluate the environmental consequences of its decision on where to house the F-35A.  In December of 2009, the Air Force initiated scoping, a series of meetings and other public outreach, which provided the agency with public input on the nature and extent of the issues and impacts to be addressed in its analysis.  AR10510 (FEIS 1-8).  In early 2010, a

formal scoping meeting was held in Winooski; later additional informational meetings were held at a South Burlington City Council meeting, in Winooski, and on Burlington AGS. AR10640 (FEIS BR4-14). Those meetings informed the Air Force that, not surprisingly, the public's "primary issue was concern about noise generated from the airport." AR10641 (FEIS BR4-15).

Aware the F-35A is louder than the aircraft it is replacing, the Air Force considered means by which it could avoid or reduce noise impacts as it analyzed the F-35A basing alternatives. *See* AR10451 (Record of Decision (ROD) 4). To that end, the Air Force pledged to utilize advanced simulator training to the extent practicable to reduce flight hours and to adhere to a number of flight restrictions intended to minimize noise impacts to the adjacent communities, including all the restrictions on operations currently employed at Burlington. *See* AR10565-66 (FEIS 2-49 - 2-50); AR10645 (FEIS BR4-19).

When the Draft Environmental Impact Statement ("DEIS") was released in March of 2012, mission criteria led to Burlington AGS being designated the preferred alternative. AR4998 (DEIS 2-19). Burlington AGS is the home of the 158th Fighter Wing, the sole flying unit of the Vermont Air National Guard ("VTANG"). The VTANG, known locally as the Green Mountain Boys, currently flies and maintains eighteen F-16 aircraft at Burlington International Airport ("BIA").

The DEIS informed the public that despite the Air Force's efforts to minimize noise, noise impacts are unavoidable, AR5014 (DEIS 2-45), because the F-35A is louder than the aircraft it will replace in almost every type of operation. *See* AR5093 (DEIS BR4-18). The DEIS presented a detailed assessment of those impacts.[4] The DEIS also informed the public that

---

[4]     Plaintiffs do not challenge the Air Force's analysis regarding how basing the F-35A at Burlington AGS will change the noise contours at and around the Burlington airport. In other words, at least insofar as noise impacts are concerned, Plaintiffs concede that the Air Force has

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 3**

the F-35A is constructed with composite and low observable (or stealth) materials, AR4961 (DEIS 1-6); that the Air Force would consider cost as a factor in its decision but that mission considerations would remain paramount, AR4996 (DEIS 2-27); and that if Burlington were selected, the VTANG's F-16s "would be either reassigned or retired by the Air Force and replaced by F-35As." AR4972 (DEIS 2-3).

Publication of the DEIS initiated a series of public meetings and an opportunity to submit written comments. AR10641 (FEIS BR4-15). The prospect of basing the F-35A at Burlington prompted considerable public input, far more than any of the other candidate bases. AR10642 FEIS BR4-16). About three-quarters of the more than 1,000 comments made at public hearings and in writing opposed basing the F-35A at Burlington, largely because of concerns related to noise. *See id.*

Not long after the DEIS was published, new census data became available. Responding in part to community input requesting that Air Force use that data, the Air Force took the unusual step of publishing a Revised DEIS ("RDEIS") in May of 2013. *See* AR8520 (RDEIS EJ-15) (explaining use of new census data). Publication of the RDEIS triggered a second public comment period and also prompted the Air Force to hold two additional public meetings in conjunction with meetings of the South Burlington and Winooski City Councils. AR10643 (FEIS BR4-17). Again the vast majority of the public comments addressed Burlington. The majority of the more than 800 handwritten comments opposed basing the F-35A at Burlington, but the Air Force also received more than 9,600 postcards in favor. AR10642-43 (BR4-16 - BR4-17).

---

produced an accurate representation of the noise impacts resulting from basing the F-35A at Burlington. This is significant because the most significant environmental impact that the F-35A will have on the Burlington area is increased noise.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 4**

Like the public at large, the communities surrounding the Burlington Airport were divided, with some residents vehemently opposing basing the F-35A at Burlington and others supporting it.   Even Winooski, the community that will be the most impacted by noise, was split. *See* AR62941 (Winooski City Council letter).   Ultimately, Winooski's City Council opposed the basing, while the South Burlington City Council supported it.   *See* AR12712 (Winooski), AR12178 (South Burlington).

The Air Force released the Final EIS ("FEIS") in September 2013.   The FEIS presented a detailed analysis of the environmental consequences of housing the F-35A at each candidate base and summarized those consequences in a series of tables. [5]   *See* AR10547– AR10560 (FEIS 2-31 - 2-44).   The Air Force, well informed of the environmental consequences of its decision and of the views of the local population, selected Burlington AGS to be the home of a squadron of F-35A aircraft.   AR12882 (ROD 2).

The Record of Decision explained that although "[t]he Air Force considered all practical means to avoid or minimize environmental harm," AR10454 (ROD 7), the beddown of the F-35A at Burlington will "result in disturbance and/or noise within areas not previously or recently subjected to these effects."[6]   AR10455 (ROD 8).   Consequently, the Air Force committed to conduct a noise study after the F-35As are operating at the base "in order to re-

---

[5]     After the close of the comment period on the FEIS, Plaintiffs submitted requests for Supplemental Environmental Impact Statements evaluating (1) the risks created by use of composite and stealth materials in the F-35A and (2) an alternative without either F-35As or F-16s at Burlington.   As is discussed below, the Air Force concluded those requests were not "significant new information" requiring a Supplemental EIS.

[6]     That statement is an acknowledgment that the noise contours at the Burlington airport have periodically changed as the aircraft flying out of the airport have changed or been modified. For instance, the 65 dB noise contour extended well into the City of Winooski prior to a change in the F-16s being flown by the VTANG.   *See* AR25163 (2006 NEM maps).

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 5**

evaluate projected noise levels." AR10452 (ROD 5).   That study will be the first step in an

"adaptive management program," a long-term mitigation "process built around a continuous

cycle of experimentation, evaluation, learning, and improvement over time." AR10451 (ROD

4).

## III.    PLAINTIFFS' CLAIMS

Plaintiffs bring suit contending that the Air Force failed to comply with the

requirements of the NEPA.   Plaintiffs repeatedly note factors that, in their view, ostensibly make

other bases a better choice than Burlington.   NEPA does not provide a means to challenge the

merits of an agency's decision; "NEPA itself does not impose substantive duties mandating

particular results, but simply prescribes the necessary process for preventing uninformed—rather

than unwise—agency action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 333

(1989).

Plaintiffs' claims largely ask this Court to impose unwarranted demands on the

NEPA process.   Moreover, Plaintiffs wholly ignore the venerable "rule of reason," which applies

to any "claim that an EIS fails to contain sufficient information to satisfy NEPA," *Sierra Club v.*

*U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1029 & n. 18 (2d Cir. 1983) (citation omitted), and,

*inter alia,* instructs that NEPA review is not to be a hunt to surface any deficiency in an EIS, no

matter how minor. *E.g., Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66,

75 (D.C. Cir. 2011); *see also Nat. Res. Def. Council (NRDC) v. Callaway*, 524 F.2d 79, 88 (2d

Cir. 1975); *Dep't. of Transp. v. Pub. Citizen*, 541 U.S. 752, 753-56 (2004).

As set out in detail in the argument below, and briefly summarized here, each of

Plaintiffs' claims must fail:

**Counts One and Three**:  Plaintiffs claims regarding the Air Force's mitigation analysis fail because Plaintiffs ignore the Supreme Court's clear instruction in *Robertson* that an agency's discussion of mitigation measures need only be "reasonably complete."  Plaintiffs instead attempt to apply the requirements applicable to analysis of *reasonable alternatives*, which are much more demanding than what is required for *mitigation* analysis.  The Air Force's mitigation analysis provided the requisite "reasonably complete discussion of possible mitigation measures, 'such that fair evaluation of the environmental consequences of the alternatives and chosen action are possible.'"  *Vt. Pub. Interest Research Grp. v. U.S. Fish & Wildlife Serv.,* 247 F. Supp. 2d 495, 525 (D. Vt. 2002) (*quoting Robertson,* 490 U.S. at 352).

**Count Two**:  Plaintiffs complain that the Air Force failed to discuss inconsistencies between basing the F-35A at Burlington and various state and local laws or plans, but no such inconsistency exists because those plans and laws are either inapplicable or express preferences rather than requirements.  See *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.,* 524 F. Supp. 2d 642, 714 (D. Md. 2007).   Further, as illustrated by the comments of the South Burlington Planning Commission, the FEIS provided data and analysis that reasonably allowed the decision-maker and the public to understand possible conflicts between the proposed action and the *objectives or goals* of local land use laws and plans.

**Count Four**:  Plaintiffs' allegation that the Air Force was required to identify each individual historic property subject to noise impacts—rather than historic

districts—has no legal support and violates the "rule of reason" because doing so would not generate information of significant value to either the public or the Air Force's decision-makers.  Plaintiffs' assertion that the Air Force should have analyzed the hypothetical "purchase and razing" of historic properties by the City of Burlington also finds no support in the law because that "impact" is not a reasonably foreseeable impact of the Air Force's decision to beddown the F-35A at Burlington AGS.

**Count Five:**  Plaintiffs' claim that the Air Force should have analyzed a "no military aircraft" alternative is based on Plaintiffs' untenable assertion that had Burlington not been selected to host the F-35A, the "most likely" result would have been no military aircraft at Burlington.  Setting aside the unlikeliness of the VTANG, the 158th *Fighter* Wing, simply abandoning its long-standing flying mission had Burlington not been selected to host the F-35A; a "no military aircraft" alternative is patently unreasonable because the purpose of the Air Force's action was to find a home for the F-35A.

**Count Six and Nine:**  Plaintiffs claim the Air Force was required to supplement its Final EIS based on their belated assertions regarding purported risks associated with the F-35A's use of composite and stealth materials.  Air Force experts thoroughly addressed the risks those materials posed in the event of a crash and determined that those risks are not significantly different than the risks created by the crash of an F-16.  Plaintiffs' claims fail because an agency has the right to rely on the opinions of its own experts.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

**Count Ten:** Plaintiffs' claim that the Air Force improperly relied on the "overall cost" of basing the F-35A at the three candidate bases fails because it asks this Court to construe the applicable regulations in a manner unsupported by either case law or the plain language of the regulations. Moreover, the count rests on the unfounded assumption that the Air Force's decision was driven by cost considerations. To the contrary, the Air Force consistently informed the public it would consider cost, including the "cost to implement," but mission requirements would be the pre-eminent consideration.

### *Argument*

## I.    STANDARD OF REVIEW.

### A.    Review Under the APA is Both Limited and Deferential.

Plaintiffs bring claims pursuant to NEPA. Because NEPA does not provide a private right of action, Plaintiffs' claims are reviewed pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701-06 ("APA"). *See Brodsky v. Nuclear Reg. Comm'n,* 704 F.3d 113, 119 (2d Cir. 2013); *Vermonters for a Clean Env't, Inc. v. Madrid,* 73 F. Supp. 3d 417, 422 (D. Vt. 2014)

Although this Court's review "is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971) *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977). The APA's limitations on judicial review serve "to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 66 (2004). Thus, a "reviewing court may not itself weigh the evidence or substitute its

judgment for that of the agency." *Islander E. Pipeline Co. v. McCarthy,* 525 F.3d 141, 150 (2d Cir.2008),

The Air Force's NEPA analysis is entitled to "a presumption of regularity" and must be affirmed unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Overton Park,* 401 U.S. at 414-15; *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 89 (2d Cir. 2000); *Vt. Pub. Interest,* 247 F. Supp. 2d 495 at 505.

**B.    The Scope of Review in a NEPA Case is Narrow and Requires Application of the Rule of Reason.**

NEPA "is a procedural statute that mandates a process rather than a particular result. . . . [It] does not command an agency to favor any particular course of action, but rather requires the agency to withhold its decision to proceed with an action until it has taken a 'hard look' at the environmental consequences." *Fund for Animals v. Kempthorne*, 538 F.3d 124, 137 (2d Cir. 2008) (quoting *Stewart Park & Reserve Coal., Inc. (SPARC) v. Slater,* 352 F.3d 545, 557 (2d Cir. 2003)); *see also Pub. Citizen*, 541 U.S. at 756-57. That "hard look" serves to inform agency decision makers of the environmental impact of a proposed action and the public processes required by NEPA to inform the public that the agency "has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (citation omitted).

"Significantly, 'if the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.'" *NRDC v. U.S. Dep't of Agric.*, 613 F.3d 76, 83 (2d Cir. 2010) (quoting *Robertson,* 490 U.S. at 350. Thus, judicial review under NEPA focuses "'on the procedural regularity of the decision,' rather than on its substance." *Brodsky*, 704 F.3d at 118-19 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs,* 772 F.2d 1043, 1055 (2d Cir.

1985)).  As a result, the "scope of judicial review of an EIS is 'narrow.'" *NRDC v. FAA*, 564 F.3d

549, 556 (2d Cir. 2009) (quoting *Sierra Club,* 701 F.2d at 1029).

   An inescapable characteristic of the NEPA process is that it "involves an almost

endless series of judgment calls. . . . It is of course always possible to explore a subject more

deeply and to discuss it more thoroughly.  The line-drawing decisions necessitated by this fact of

life are vested in the agencies, not the courts.  The [reviewing courts'] 'role ... is simply to ensure

that the agency has adequately considered and disclosed the environmental impact of its actions

and that its decision is not arbitrary or capricious.'" *Coal. on Sensible Transp., Inc. v. Dole*, 826

F.2d 60, 66 (D.C. Cir. 1987) (quoting *Balt. Gas & Elec.,* 462 U.S. at 97-98).

   Because NEPA analysis has the potential to be "all-encompassing in scope," the

Second Circuit long ago cautioned that "an EIS is required to furnish only such information as

appears to be reasonably necessary under the circumstances for evaluation of the project."

*NRDC v. Callaway***,** 524 F.2d 79, 88 (2d Cir. 1975) (citations omitted) .  A few years later, that

court reiterated that "an EIS need not be exhaustive to the point of discussing all possible details

bearing on the proposed action" and instead need only "set[] forth sufficient information to

enable the decision-maker to consider fully the environmental factors involved and to make a

reasoned decision. . ." *Cty. of Suffolk v. Sec'y of the Interior,* 562 F.2d 1368, 1375 (2d Cir. 1977).

   From these and other early NEPA cases emerged the "rule of reason," which

applies to any claim that contends an EIS lacks sufficient information to satisfy NEPA.  *Sierra*

*Club*, 701 F.2d at 1029 n.18 (citing *Cty. of Suffolk,* 562 F.2d at 1375); *see also Pub. Citizen*, 541

U.S. at 754 ("inherent in NEPA and its implementing regulations is a 'rule of reason'") (citations

omitted).  The rule recognizes that an EIS cannot "discuss[] all possible details bearing on the

proposed action[,]" *Cty. of Suffolk*, 562 F.2d at 1375, and therefore generally bounds the level of

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND**
**IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 11**

detail required in an EIS to that which is reasonably necessary under the circumstances to evaluate the proposed action. *Callaway*, 524 F.2d at 88.

The rule requires an agency's analysis to be affirmed where it presents "sufficient information to enable the decision-maker to consider fully the environmental factors involved and make a reasoned decision[.]" *Town of Huntington v. Marsh,* 859 F.2d 1134, 1140 (2d Cir. 1988); *Senville v. Peters*, 327 F. Supp. 2d 335, 346-47 (D. Vt. 2004). Further, the rule requires a reviewing court to consider "the usefulness of any new potential information" that a plaintiff contends should have been developed. *See Pub. Citizen,* 541 U.S. at 754; *see also Tinicum Twp., Pa. v. U.S. Dep't of Transp.,* 685 F.3d 288, 296 (3d Cir. 2012) ("NEPA does not require maximum detail. Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information."); *Theodore Roosevelt*, 661 F.3d at 75 (under rule of reason judicial review is not to be a hunt "for any deficiency [in an EIS] no matter how minor").

Despite its obvious application to many of their claims, Plaintiffs do not even mention this fundamental principle of judicial review of NEPA claims.

C.   **Judgment on the Record in Favor of the Air Force is Appropriate.**

Plaintiffs have moved for summary judgment or judgment on the record and Defendant has cross-moved for judgment on the record.   A motion for judgment on the record is the functional equivalent of a motion for summary judgment with the administrative record effectively providing the "undisputed material facts," allowing judgment to be rendered as a matter of law. *See Vermonters*, 73 F. Supp. 3d at 421 n.2 (construing a motion for summary judgment as a motion for judgment on the administrative record and noting that the record provides the evidence upon which the motion would be decided).   In any event, the essential

standard of review under either motion is the same.  *See Muller v. First Unum Life Ins. Co.,* 341

F.3d 119, 124 (2d Cir. 2003);

       Because the administrative record now before the Court provides the necessary

facts, the parties' cross-motions serve as the mechanism for this Court to decide, as a matter of

law, whether the Air Force's action is supported by the administrative record and is otherwise

consistent with the APA standard of review.[7]  *See Bloch v. Powell,* 227 F. Supp. 2d 25, 31

(D.D.C.  2002), *aff'd,* 348 F.3d 1060 (D.C. Cir. 2003); *accord Bennett v. Donovan*, 4 F. Supp. 3d

5, 8 (D.D.C. 2013); *see also Physicians Comm. for Responsible Med. v. Johnson,* 436 F.3d 326,

331 (2d Cir. 2006) (resolving conflict over agency action and interpretation of a statute in the

context of cross-motions for summary judgment).

## II.     THE AIR FORCE'S DISCUSSION OF POSSIBLE MITIGATION PROVIDED SUFFICIENT DETAIL TO ENSURE FAIR EVALUATION OF THE

---

[7]     Plaintiffs make the curious suggestion that when "facts are settled," as is the case when the administrative record provides the pertinent facts, "the arbitrary and capricious standard does not govern."  Dkt. No. 47 at 6 (citing *Marsh,* 490 U.S. at 377).  But the passage Plaintiffs quote from *Marsh* reiterates the deference due to agency decision-making, and the Supreme Court's holding clarified that an agency's decision on whether to prepare a supplemental environmental impact statement, like other NEPA claims, "is controlled by the 'arbitrary and capricious' standard of § 706(2)(A)." *Marsh*, 490 U.S. at 376.  Plaintiffs further suggest that *Senville v. Peters*, 327 F. Supp. 2d 335 (D. Vt. 2004) demonstrates that the arbitrary and capricious standard is inapplicable.  Dkt. No. 47 at 6.  The case is readily distinguished.  In *Senville*, Judge Sessions applied the "not in accordance with law" standard of the APA to the Federal Highway Administration's consideration of cumulative impacts because the agency had "fail[ed] to produce *any* environmental document that address[ed] the cumulative impacts" of the project. *Id*. at 369-70 (emphasis added).  Here, Plaintiffs challenge the extent to which the Air Force addressed topics such as mitigation and local land use plans, rather than alleging a complete failure to address those topics.

**ENVIRONMENTAL CONSEQUENCES OF BASING THE F-35A. [COUNTS ONE AND THREE].[8]**

NEPA requires only "a reasonably complete discussion of possible mitigation measures" that provides "sufficient detail to ensure that environmental consequences have been fairly evaluated." *Robertson,* 490 U.S. at 352; *see also Vt. Pub. Interest*, 247 F. Supp. 2d at 525 (discussion of mitigation measures is reasonably complete when a "fair evaluation of the environmental consequences of the alternatives and chosen action are possible.") (citations omitted).  The Air Force's discussion of mitigation satisfied NEPA because it provided a reasonably complete discussion of both operational mitigation measures, which directly reduce the impact of noise from the F-35A, and mitigation measures potentially available to the City of Burlington pursuant to the Federal Aviation Administration's ("FAA") Part 150 program,[9] and presented sufficient information to ensure a fair evaluation of the environmental consequences of basing the F-35A at Burlington and the alternative locations.

In *Robertson*, the Supreme Court also emphasized that NEPA does not require an agency to actually adopt mitigation.  490 U.S. at 353. *Accord Vt. Pub. Interest,* 247 F. Supp. 2d at 525 ("there is no substantive requirement that any mitigation measure actually be undertaken either by the agency or a third party") (citations omitted).  Here, however, the Air Force proposed specific mitigation measures in the FEIS, AR10565 – AR10567 (FEIS 2-49 – 2-51), adopted

---

[8]      This argument also responds to the Motion for Partial Summary Judgment filed by Plaintiff City of Winooski (Dkt. No. 45).

[9]      The program is referred to as the Part 150 program because it is located at 14 C.F.R. Part 150 of the Code of Federal Regulations.  The Part 150 program permits the FAA to support and fund local airport noise compatibility planning and projects once the airport operator (the City of Burlington) has developed a noise compatibility program (NCP) and the NCP has received FAA approval.  *See* AR10645 (FEIS BR4-19).  The Part 150 program is discussed below and an overview of the program is at AR15900.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 14**

those measures, AR10451 (ROD 4) and directed the creation of a Mitigation Management Plan

(MMP) to ensure those measures will be implemented.   AR65697 (MMP).   The mitigation

measures addressing noise adopted by the Air Force consist of support for the BIA's Part 150

Program and operational measures intended to decrease the impact of F-35A noise on the

surrounding community by either directly reducing the generation of noise, or confining the time

or area in which it is generated.   *See* AR6570507 (MMP 6-8, Actions 5-8).   Those operational

measures are the most effective means of mitigation and because they are under the Air Force's

control, can be implemented immediately.

The Air Force also imposed additional measures to enhance the effectiveness of

its operational mitigation.   Because the F-35A was not in regular operation when the noise

modeling was done, the modeling necessarily included assumptions about how the F-35A will be

operated.[10]   As a result, Air Force included an adaptive management program as part of the

MMP.   AR10451 (ROD 4); AR65700 (MMP).   Once the F-35A is flying, noise will be evaluated,

the assumptions in the modeling tested, and operating procedures may be modified to further

---

[10]      The Air Force's noise modeling followed the general convention of using an outdoor day-night average ("DNL") value of 65 dB in its noise analysis.   *See* AR10578 (FEIS 3-8).   That value is used, in part, because "[m]ost people are exposed to sound levels of 50 to 65 dB DNL or higher on a daily basis."   *Id.*   DNL does not represent the sound level heard at any particular time, but rather is intended to represent the total noise impact at a given location, which correlates with the level of annoyance produced by the sound.   AR11559-60 (FEIS C-10 - C-12).   To measure that impact, DNL accounts for the sound level of individual noise events, the duration of those events, and the number of events.   AR10578 (FEIS 3-8); AR11557 (FEIS C-8).

One aspect of the Air Force's modeling did diverge from the general practice, but that divergence had the effect of *increasing* the size of the resulting noise contours and consequently, the extent of the impacts.   DNL noise figures are typically shown as annual averages, with a calculated amount of noise generally divided by the 365 days in a year to produce that average.   *See e.g.*, AR25143 (noting that the Part 150 program requires use of DNL to depict noise over calendar years).   The Air Force, however, used 260 days (fifty-two five-day weeks) as its "year" rather than 365 days (AR56824), resulting in larger noise contours because the operations were modeled over fewer days.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND
IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 15**

reduce noise as warranted.  *See* AR10566 (FEIS at 2-50); AR65702 (MMP 3).  The Air Force has "commit[ed] to working with the affected communities" as it implements this adaptive management plan.  *See* AR10566 (FEIS at 2-50).

A decision that includes both fixed mitigation measures and an adaptive management plan specifying steps an agency will take to provide mitigation, "amply fulfills NEPA's mandate to discuss mitigation measures." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010).  Here, however, the Air Force took the further step of pledging to participate in the BIA's Part 150 process as necessary "to effectively coordinate, implement and continually assess noise mitigation measures and management actions." AR65702 (MMP 3); *see also* AR10567 (FEIS 2-51).

### A.  The Air Force Provided a Reasonably Complete Discussion of Mitigation Measures With Sufficient Detail to Ensure Environmental Consequences Have Been Fairly Evaluated.

As noted above, in *Robertson*, the Supreme Court conclusively set the standard for an agency's discussion of mitigation.  Plaintiffs' argument is striking because although they discuss *Robertson* at great length, they never acknowledge the Supreme Court's instruction that a discussion of mitigation need only be "reasonably complete."  490 U.S. at 352.  Instead, Plaintiffs contend an agency's discussion of mitigation measures must be as "detailed" as its discussion of reasonable alternatives to the proposed action.  *See* Dkt. 47 at 18.  Plaintiffs' attempt to equate mitigation measures with reasonable alternatives not only flies in the face of *Robertson*, it is also inconsistent with the NEPA regulations Plaintiffs purport to rely on.

### 1.  Mitigation measures need not be evaluated in the same level of detail as reasonable alternatives.

Plaintiffs use the term "mitigation alternatives," Dkt. No. 47 at 7, in an attempt to import the requirements of 40 C.F.R. § 1502.14(c) to the analysis of mitigation measures, but that section refers to reasonable alternatives to the proposed action, not "mitigation alternatives." Indeed, the NEPA regulations do not use the term "mitigation alternatives" to address means for mitigation, they refer to them as "mitigation measures" almost exclusively.[11] *See* 40 C.F.R. §§ 1502.14(f), 1502.16(h), 1503.3 (d), 1505.3 (c), and 1508.25(b)(3) . Thus, the regulations, like *Robertson*, provide no support for the proposition that mitigation measures are to be evaluated as if they were full blown alternatives.

2.      **The Air Force was not required to assess the cost of potential mitigation measures.**

Plaintiffs further misread *Robertson* by suggesting it requires an EIS to include a "detailed examination of the comparative public and private costs of various mitigation alternatives." Dkt. No. 47 at 19-20.  Despite *Robertson* having been decided almost thirty years ago, Plaintiffs fail to identify a single decision interpreting *Robertson* as they urge this Court to do.[12]  That is not surprising.  In *Robertson* the Supreme Court rebuked the Ninth Circuit for

---

[11]      The one exception is 40 C.F.R. § 1504.3(c)(2)(vi).  That provision, which pertains to "interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects," 40 C.F.R. § 1501(a), requires the objecting agency to specify "what mitigation alternative, further study, or other course of action . . . are necessary to remedy the situation."  40 C.F.R. § 1504.3(c)(2)(vi)

[12]      The only case Plaintiffs cite, *Chelsea Neighborhood Ass'n. v. U.S. Postal Serv.*, 389 F. Supp. 1171, 1180 (S.D.N.Y.), *aff'd on other grounds*, 516 F.2d 378 (2nd Cir. 1975), is a pre-*Robertson* decision that does not even discuss the requirements for addressing mitigation in a NEPA document.  Instead that court faulted the Postal Service for failing to account for the cost of acoustical treatment that was required to meet standards imposed by the Department of Housing and Urban Development, and therefore to obtain the funding necessary to construct the project.  *Id*. at 1180-81.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 17**

reading NEPA to require "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action." 490 U.S. at 353. In the wake of *Robertson*, courts have consistently emphasized that NEPA requires neither actual mitigation nor even "that a complete mitigation plan be actually formulated, finalized, adopted, or legally enforceable." *E.g., Vt. Pub. Interest*, 247 F. Supp. 2d at 525 (citations omitted). Given that the Air Force had no obligation to develop a mitigation plan, it follows that the agency had no obligation to produce "a detailed examination of the comparative public and private costs" of various potential mitigation measures. *Cf.* Dkt. No. 47 at 19.

> **3.** **The Air Force's discussion of mitigation was reasonably complete and allowed a fair evaluation of the environmental consequences of the proposed action and alternatives.**

As explained above, the Air Force went beyond the procedural mandate of NEPA and not only discussed, but actually provided all the reasonable mitigation measures within its control. *Cf. Vt. Pub. Interest*, 247 F. Supp. 2d at 525 (NEPA does not require that a complete mitigation plan be actually formulated, finalized, adopted or legally enforceable) (citing *Robertson*, 490 U.S. at 352). The Air Force also adopted an adaptive management program which will allow the mitigation to be refined and its effectiveness increased.

Plaintiffs nonetheless assert the Air Force's discussion of mitigation was inadequate because it should have discussed the FAA's Part 150 program in greater detail. The Part 150 program allows airport operators to obtain Federal grants for noise abatement projects. AR15900. The program is completely voluntary. Airport operators who elect to participate must develop a Noise Compatibility Program ("NCP"). The NCP guides the operator's efforts to "achiev[e] the maximum degree of noise compatibility between and airport and its neighbors," and addresses both land use measures and means to mitigate an airport's noise impact.

AR15902.  If the NCP is approved, the operator may apply for a grant covering seventy-five to ninety percent of costs "to carry out the planning, acquisitions, relocations, and construction" proposed by the airport operator.  AR15903.  Here, the airport operator (the City of Burlington) has developed an NCP, AR25127, and Burlington's NCP has been approved by the FAA. AR53218.

Although the Air Force has no authority or control over the Part 150 Program, and is not bound by it, the Air Force committed to continue operational restrictions outlined in Burlington's NCP, including quiet hours, use of certain routes and single take-offs (as opposed to taking off in formation).  AR10645 (FEIS BR4-19).  The Air Force also discussed Burlington's stated plans to develop an update for the NCP "to include F-35A operations" and explained that the update "may include many facets to address noise, including home purchase, sound insulation, and land based noise mitigation measures."[13]  *Id.*

Updating the NCP to address F-35A operations will require the City to formulate a plan for addressing noise at the airport, including the geographic scope of the area for which it will seek authority.  *See* AR53218 (approving a geographic expansion of the NCP).  The City's consideration of revisions to the NCP will be informed by a public process, 14 C.F.R. § 150.23(d), in which Plaintiffs and the City of Winooski will have the opportunity to participate. The City's proposed NCP will then be subject to possible modification and approval by the FAA. *See* AR10692 (FEIS BR4-66); 14 C.F.R. § 150.35(a).  Once the City receives approval of the revised NCP, it will face decisions on how to implement the measures authorized in the NCP.

---

[13]    An update of an NCP occurs when the FAA approves revisions to that plan.  *See* AR15902.

Importantly, how and when the updated NCP is developed, and how it will be implemented, are the City's decisions. While the Air Force has committed to provide technical assistance to the City, the Air Force will have no control over how, and even whether, mitigation identified in the NCP is used. Consequently, while the FEIS informed agency decision-makers and the public of the variety of mitigation that *might* be applied under the Part 150 program, it cautioned that any such mitigation can only be provided by "the FAA and the City of Burlington under the Noise Compatibility Program." AR10645 (BR4-19). Thus, just as the Supreme Court found was proper in *Robertson*, "the EIS identified actions that could be taken by the [local] government to mitigate the adverse effects of [the proposed action.]" 490 U.S. at 340.

Given the undeveloped nature of the Part 150 program with respect to the F-35A, and the large number of variables inherent in its development and application, the Air Force's discussion of the program was reasonably complete. Indeed, because the Air Force will have no control over the process by which the NCP will be updated, or the City's decision-making when and if the NCP is updated, any assessment of whether, how, or where any Part 150 mitigation might be applied would have required speculation, a practice that courts applying NEPA have long disowned.[14] *See, e.g., Envtl. Def. Fund, Inc. v. Hoffman*, 566 F.2d 1060, 1067 (8th Cir. 1977); *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180 (9th Cir. 1990).

---

[14]   Plaintiffs suggest that the Council on Environmental Quality's "Forty Most Asked Questions" paper required the Air Force to speculate about the probability that Part 150 mitigation will be used and to document the history of its use. Dkt. 47 at 20 n. 13. Neither is required. As Plaintiffs acknowledge, the Forty Questions document is merely an informal statement, not a regulation, and has power to persuade only to the extent it is consistent with the NEPA regulations. Dkt. 47 at 6 n. 18. Indeed, the Forty Questions document itself admonished "[t]hese answers, of course, do not impose any additional requirements beyond those of the NEPA regulations." 46 Fed. Reg. 18026. Like other courts, this District has recognized that any guidance provided by the Forty Questions must yield when it conflicts with the rule of reason. *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234, 244-45 (D. Vt. 1992) *aff'd*, 990 F.2d 729 (2d Cir. 1993) (citing *Cabinet Mountain Wilderness v. Peterson*, 685 F.2d 678, 682

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 20**

Any speculation the Air Force might have provided would have been of little value to the public.  For instance, any suggestion that the City would use Part 150 to insulate homes in any particular location would only raise expectations that might never be realized.  Nor would speculation about the application of Part 150 have benefited the decision-maker.  *Cty. of Suffolk*, 562 F.2d at 1378 ("If the additional information would at best amount to speculation as to [a] future event or events, it obviously would not be of much use as input in deciding whether to proceed.")).

Plaintiffs not only ignore the speculative nature of the discussion they seek, but also the value of the discussion that the Air Force did provide.  The Air Force openly, and repeatedly, informed the public that the Air Force itself has no authority to fund sound-proofing or any of the other measures available under that program, and that if such measures were implemented, it would be up to the City of Burlington and the FAA.  *E.g.*, AR12868 (FEIS E-1237).  Further, by identifying the use of Part 150 as a potential mitigation measure, the FEIS served to alert the City and the FAA to the expected consequences and encouraged them to "plan and implement corrective measures in a timely manner."[15]  *Robertson,* 490 U.S. at 350.

_____

(D.C. Cir. 1982)).  The Air Force's discussion of the Part 150 program comports with the rule of reason because the Air Force had no basis to speculate about the probability of Burlington taking any particular action under the part 150 program and the EIS did note that Part 150 had been used to purchase homes only "in coordination with the City of South Burlington."  *See* AR10721 (FEIS BR4-95).

[15]    To the extent Plaintiffs are arguing that the Air Force was required to wait until the BIA's Part 150 program is fully developed to take action, that argument has been flatly rejected by the Supreme Court.  As the Court explained, when it is a third=party such as the City of Burlington that has the authority to provide certain mitigation, "it would be incongruous to conclude that the [Air Force] has no power to act" until the City has decided what mitigation it will impose.  *Robertson,* 490 U.S. at 352-53; *see also id.*at 353 n.16 ("Because NEPA imposes no substantive requirement that mitigation measures actually be taken, it should not be read to require agencies to obtain an assurance that third parties will implement particular measures.").

The Air Force's discussion of mitigation also met the twin information aims of NEPA by informing both the public and the decision-maker of the extent to which the operational measures adopted by the Air Force will be effective in mitigating noise and that the Part 150 program cannot be relied on to ameliorate the noise impacts of basing the F-35A at Burlington. *See Balt. Gas & Elec.*, 462 U.S. at 97. As Plaintiffs acknowledge, the FEIS informed the decision-makers and the public that the environmental impacts of basing the F-35A at Burlington would be greater than basing the F-35A at either Jacksonville or McEntire, even with all of the operational mitigation presently available. Dkt. No. 47 at 68.

**B.     The Air Force Had No Obligation to Discuss the Environmental Consequences That Might Result Should Homes in Winooski be Purchased and Razed.**

Plaintiffs assert that the purchase and razing of homes in Winooski is a "reasonably foreseeable" effect of the Air Force's decision to beddown the F-35A at BIA. Dkt. No. 47 at 26 (quoting 40 C.F.R. § 1508.8). Thus, Plaintiffs assert that the Air Force was required to discuss the impact purchasing and razing homes would have on Winooski. *Id.* at 28. Plaintiffs' argument fails because it rests on an assumption that Burlington's past practice of purchasing homes in South Burlington within the 65 dB DNL zone makes it reasonably foreseeable that homes will be purchased in Winooski. *Id.* at 27. To the contrary, the record demonstrates that it is not.

The Air Force lacks both the desire and the authority to purchase and demolish homes. *See, e.g.*, AR12869. As was explained above, any use of the Part 150 program to purchase homes in Winooski would depend on actions by the City of Burlington and would be the end result of a process that includes a number of contingencies. *See Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 206 (1st Cir. 1999) (because possible airport expansion was

"contingent on several events that may or may not occur" the expansion was speculative and not reasonably foreseeable).

In addition, the content of the NCP reiterates that the use of the Part 150 program to purchase homes within Winooski is not reasonably foreseeable.  The NCP requires the City of Burlington to "coordinate its land acquisition program," including how the boundaries of that program are defined, "with the applicable jurisdiction [i.e., Winooski]."  AR25155.  Importantly, the program requires the City of Burlington to "defer to any objections that the applicable jurisdiction has to the proposal."  *Id.*  In short, those provisions give the City of Winooski the ability to veto any plan to purchase homes within its jurisdiction.

The contingencies involved before *any* homes could be purchased and razed in Winooski, and the ability of Winooski to veto any purchase means the use of Part 150 to purchase homes in Winooski is not reasonably foreseeable; rather, it is "speculative and contingent."  *Vill. of Grand View v. Skinner,* 947 F.2d 651, 659 (2d Cir. 1991).  *Grand View* is informative because the Second Circuit relied on several factors present here to hold that construction of a second span of the Tappan Zee Bridge across the Hudson River was not reasonably foreseeable, even though the New York Department of Transportation had done a Tappan Zee Corridor Study which indicated a probable need for a second span of the bridge and identified the most practical location for that span. 947 F.2d at 659.

Despite that relative specificity, the Second Circuit found the second span "speculative and contingent" and concluded that the FHWA was justified in "not explicitly addressing" the cumulative impacts resulting from a second span because, *inter alia,* to do so would have been "impractical;" any construction of a new bridge would require consideration of

environmental issues; and the construction of the proposed second span of the bridge was only one of several possible means to address future traffic needs in the area. *Id*.

Each of those reasons are applicable here. First, given the number of contingencies regarding whether, how, or when the City's Part 150 program will be applied, it was impractical for the Air Force to further evaluate the program's potential impacts. Second, a public process will occur before the Part 150 program is updated. Winooski will have an opportunity to make its concerns known. *See* AR25177; 14 C.F.R. § 150.23(d). Moreover, any mitigation actions developed under the program will be subject to applicable local, state and Federal environmental laws. *See* AR53219. Third, use of the Part 150 program to purchase and raze homes in Winooski is just one of any number of actions the City of Burlington might take in implementing the Part 150 program—and a most unlikely one given the present requirement that homes can only be purchased with the consent of the governing municipality. *See* AR25155.

### C.   The Air Force Reasonably and Adequately Responded to Comments.

Both Plaintiffs and the Plaintiff City of Winooski provided comments requesting explanation of how the Part 150 program might be applied, either to purchase homes within Winooski or to provide home improvements such as sound insulation. *See* Dkt. No. 47 at 30; Dkt. No. 45 at 5-6. Plaintiffs contend the former were "ignored" and the latter "dismissed" with only a one sentence explanation. Dkt. No. 47 at 30. Plaintiffs are wrong on both counts.

A few months after the release of the Draft EIS, the Winooski City council issued a resolution which provided "comment" on the DEIS. AR8282; *see also* AR52074. The resolution authorized the Mayor to meet with "command staff at the Vermont Air National Guard Base." AR8283. He and other City representatives did so only days later. *See* AR52735 (E-mail following up on meeting).

After the meeting, the Winooski City Manager submitted a written list of questions. AR52521, AR52519. That prompted a string of e-mail conversations in which the VTANG's Environmental Manager provided the City Manager with additional information. *See e.g.*, AR52709, AR52729. The VTANG then produced a written response to the City's questions that explained technical aspects of operations and related noise, as well as potential impacts of concern to the City, such as those on property values. *See* AR52974-77. The memorandum also provided the City with important information regarding mitigation.

The VTANG discussed the operational mitigation adopted by the Air Force and potential operational changes the VTANG was evaluating. AR52975. The VTANG also responded to the City's request for information on mitigation used at other airports that could also be used at Burlington by discussing the FAA's Part 150 program. The VTANG explained that use of the Part 150 program is initiated by City of Burlington, after approval by the FAA, and includes opportunities for public involvement. AR52976. It also explained that once approved, the Part 150 program could potentially be used for "sound insulation of properties within the 65 dB DNL contour and land-based mitigation structures, such as berms and walls on and around the airfield." *Id*.

Finally, the VTANG directly addressed the City's concern that the Part 150 home buyback program would be employed in Winooski and informed the City's representatives that "[t]he Burlington International Airport has stated it has no intention of expanding the property purchase program into Winooski." AR52977; *see also* AR25155 (NCP provision instructing that homes may only be purchased with the consent of the governing municipality).

Days after receiving the VTANG's memorandum, the Winooski City Council passed a second resolution which reiterated the City's position "that noise impacts must be

mitigated to ensure that both DNL contours and maximum noise levels remain in their current state." AR8286 (RDEIS E-1147) (City's emphases omitted). The City also made two requests of the Air Force, *if* it decided to base the F-35A at Burlington. First, the City "asked to have access to funds from the Federal Aviation Administration so that homes within the 65 dB contour could be improved." AR8287 (RDEIS E-1148). Second, the City "ask[ed] for every effort to be made by the United States Air Force to assist the Vermont Air National Guard in their efforts at noise reduction through operational adjustments." *Id.*

The City's desire for mitigation that would hold noise to present levels was certainly understandable. But as the RDEIS, and later the FEIS, informed the City and the public, its requests to maintain the current noise contours could not be met.[16] The F-35A is louder than the plane it is replacing. AR10649. Thus, even though the F-35A will fly fewer operations than the F-16, and the Air Force has imposed numerous restrictions on how the aircraft will operate, an increase in noise is an unavoidable consequence of basing the F-35A. AR8688 (RDEIS 2-51); AR10567 (FEIS 2-51).

The RDEIS also informed the City and the public that the Air Force could not provide the City with mitigation funding. As Plaintiffs acknowledge, the Air Force cannot commit to mitigation measures that are outside of its authority. Dkt. No. 47 at 21. Consequently, the Air Force could only explain that any such mitigation would have to come from the City of Burlington, the airport and the FAA pursuant to the NCP, because Congress elected to provide the FAA with authority to use its funds "for mitigating noise at private residences and noise-

---

[16]     The RDEIS included responses to comments which addressed the other points made in the City's resolutions. *See e.g.,* AR8515 (RDEIS CR-10) (responding to comment that homes could be purchased and razed); AR8522 (RDEIS GO-17) (same); AR8536 (RDEIS NS-31) (responding to comment requesting soundproofing); AR8548 (RDEIS NS-43) (pledging to work with affected communities on noise concerns).

sensitive receptors," but has not provided the Air Force with similar authority.  AR8536 (RDEIS NS-31); AR12868 (FEIS E-1237).

Finally, the Air Force was able to satisfy the City Council's request that the Air Force work with the VTANG to assess the possibility for operational improvements and did so through its commitment to the adaptive management program.  AR10451 (ROD at 4), AR10566 (FEIS 2-50); *see also* AR8548 (RDEIS NS-43).  In short, while the Air Force was unable to take the actions the City of Winooski requested, it did reasonably respond to the City's comments.

## III.   THE AIR FORCE'S DISCUSSION OF LOCAL LAND USE REASONABLY ILLUSTRATED POSSIBLE CONFLICTS BETWEEN BASING THE F-35A AND THE OBJECTIVES OF LOCAL LAND USE LAWS AND PLANS [COUNT TWO].

Plaintiffs' Count Two asserts that the Air Force's discussion of State and local laws and land use plans violated 40 C.F.R. §§ 1506.2(d) and 1502.16(c).[17]  Plaintiffs blur the two regulations together, but while both regulations address local laws and plans, they impose distinct requirements.  40 C.F.R. § 1506.2 (d) is intended to allow the NEPA process to be better integrated into State or local planning processes by requiring an EIS to discuss any "inconsistency of a proposed action with any approved State or local plan and laws."  If an inconsistency exists, the agency must then discuss "the extent to which the agency would reconcile its proposed action with the plan or law."  *Id.; see also Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 186 (4th Cir. 2005).

---

[17]   Plaintiffs also suggest that the Air Force failed to work with local communities.  *See* Dkt. No. 47 at 36.  That is not the case.  The RDEIS noted that the VTANG and the Air Force were "working with local and state officials to address specific questions and issues associated with the proposed basing of F-35A at Burlington International Airport."  AR8556 (RDEIS PI-51). The record bears this out.  For instance, as discussed above in Section II,C., the VTANG met with the Winooski City Council and addressed a series of questions it had presented, some of which touched on land use issues and means by which noise could be mitigated.  That was only one of a number of meetings with representatives of the local communities.  *See e.g.,* AR53617 (providing additional information requested at a July 2012 meeting between the VTANG and representatives of the local communities).

DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 27

40 C.F.R. § 1502.16(c) is broader in scope, but its requirements are limited. It calls for an EIS's assessment of environmental consequences to include discussion of "[p]ossible conflict between the proposed action and the objectives of Federal, regional, State and local . . . land use plans, policies and controls for the area concerned." The rule does not include any specific requirements for the content or format of that discussion. And unlike 40 C.F.R. § 1506.2(d), the regulation does not expressly require an agency to discuss the extent it will reconcile its action with those objectives.

Plaintiffs' arguments are misplaced because: (1) there is no inconsistency between the basing of the F-35A at Burlington and any of the local laws and plans cited by Plaintiffs; (2) the FEIS did illustrate the possible conflicts between basing the F-35A at Burlington and the objectives of those State and local land use plans and laws; and (3) although not required to address the extent to which its actions could be reconciled with those local authorities, the Air Force provided information which allowed the public to understand how noise would impact the objectives of local land use plans and laws.

Given that noise was the primary environmental impact, the discussion of land use issues in the FEIS logically focused "on the changes in off-base noise conditions."[18] AR10693 (FEIS BR-67). Although the FEIS did not expressly identify local land use laws and plans, it did provide the public with the information which it needed to understand the impact of noise on local land uses. The FEIS presented two tables summarizing the impact of the F-35A's

---

[18]     Plaintiffs suggest the Air Force's analysis focused on the Master Plan for the Burlington Airport developed by the VTANG. Dkt No. 47 at 32. It did not. The Air Force discussed the Master Plan merely to explain land development within the airport and its immediate surroundings which might affect land development and use. *See* AR10692 (FEIS BR4-66). Plaintiffs also suggest neither the VTANG's Master Plan nor Burlington's Noise Compatibility Program Update (cited in the FEIS as Burlington 2008, AR11279) are in the record. *Id.* at 33 n.15. The Master Plan is at AR33529 and Burlington 2008 is at AR25127.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 28**

beddown in terms of changes in the number of acres of land exposed to 65db DNL for each of seven land use classifications drawn from Chittenden County zoning data:[19] commercial, industrial, open/agricultural, public/quasi-public, recreational, residential and unclassified. AR10693 (FEIS BR4-67, Table BR3.10-2); AR10694 (FEIS BR4-68, Table BR3.10-3).  Table BR3.10-2 shows that in comparison to the present baseline, industrial and residential uses would be the most impacted, while agricultural and open space would see a significant decline in affected area.  AR10693 (FEIS BR4-67).  Further, the FEIS also presented a graphic assessment of the impact of noise on local land uses through a map showing noise contours over the local land use classifications.  AR10695 (FEIS BR4-69).  This data "illustrated the potential for the proposed action to affect land use planning activities," AR10694 (FEIS BR4-68), and thus allowed the public to understand "[p]ossible conflicts between the proposed action and the objectives of . . . local . . . land use plans, policies and controls for the area concerned."  40 C.F.R. § 1502.16(c).

To assist the public in assessing how noise would impact the land uses identified in the tables and map, the Air Force also presented guidelines developed by the Federal Interagency Committee on Urban Noise ("FICUN"), and later adopted by both the FAA and the Department of Defense.  Those guidelines make recommendations regarding the types of uses that are generally compatible, or can be made compatible, with specific levels of noise. AR11561-65 (FEIS C-12 – C-16); [20] *see also* AR14117 (FEIS 3-20) ("Levels between DNL 65

---

[19]      In order to facilitate comparison between the alternatives, the land use analysis used a standardized naming convention.  AR10691 (FEIS BR4-65).  Table BR3.10-1 provides a cross-reference between the categories used in Chittenden County zoning and the EIS.  *Id.*

[20]      Because Burlington is a commercial airport, the FAA's guidelines presented in Table C-5 apply.  *See* AR7073.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 29**

and 75 dB are considered incompatible with residential or school land uses unless measures are taken to achieve additional Noise Level Reductions (NLRs).”); AR14105 (FEIS 3-8, Table 3.2, Effects of Noise on People (Residential Land Use Only)).

The guidelines recommend that sound levels up to 65 dB DNL be considered compatible with residential use. *See* AR10692 (FEIS BR4-66); AR11562 (FEIS C-13). The FEIS explains that basing the F-35A in Burlington would result in an additional 997 households being affected by noise in excess of 65 dB DNL. AR10656 (FEIS 2-40). The affected properties were identified in graphic information system (GIS) data providing a detailed, street-by-street map showing which properties would be affected by the 65, 75, and 85 dB noise levels. *See* AR55299 (providing GIS maps).

The Air Force’s assessment of impacts on land use also provided readers with an understanding of how noise levels would affect the use of noise sensitive places such as schools, hospitals, places of worship and residential neighborhoods. AR8549 (RDEIS NS-44). It did this by quantifying the impact of noise on more than twenty representative sites through metrics measuring noise exposure, speech interference, sleep disturbance and other factors. *See* AR8537 (RDEIS NS-32); *see also* AR10650-60 (FEIS 2-34 – 2-44) (providing analysis).

**A.**    **40 C.F.R. § 1506.2(d) is Inapplicable Because There Is No Inconsistency Between the Air Force’s Actions and the Local Laws and Plans Cited by Plaintiffs.**

Plaintiffs suggest that the Air Force violated 40 C.F.R. § 1506.2(d) because it did not discuss alleged inconsistencies between basing the F-35A in Burlington and Vermont’s Act 250,[21] the South Burlington Comprehensive Plan and Noise Ordinance and a planning document

---

[21]    Act 250 is a permitting system “intended to regulate and control development so that it will not be unduly detrimental to the environment and orderly growth will be promoted.” *In re Req. for Jurisdictional Op.,* 2015 VT 41, ¶ 7, 117 A.3d at 460; *see also* Vt. Stat. Ann. 10 § 6081(a) (2015).

apparently produced by the City of Winooski.[22]  Dkt. No. 47 at 31-33.  Plaintiffs have failed to

show there is an inconsistency between the basing of the F-35A at Burlington and the

requirements of any of the cited laws or plans.

Plaintiffs contend that a "reader of the F-35 [F]EIS would have no idea that Act

250 noise standards exist[.]"  Dkt. No. 47 at 37.  In fact, a reader of the FEIS would know that

the Air Force considered Act 250 inapplicable to the basing of the F-35A.  *See* AR12857 (FEIS

E-1226).  The Air Force's position that Act 250 is inapplicable was not only consistent with the

plain language of the statute, *see* Vt. Stat. Ann. 10 § 6001(14)(A)(2015) (exempting federal

construction from the act), but was also later vindicated by the Vermont Supreme Court.  *In re*

*Req. for Jurisdictional Op.,* 2015 VT 41, ¶ 7, 117 A.3d 457 at 463-64.

Because Act 250 does not apply to the basing of the F-35A, there can be no

inconsistency between its terms and the Air Force's actions.  Similarly, South Burlington elected

to exclude the United States from the reach of its nuisance ordinance.  That ordinance applies

only to "persons," Public Nuisance Ordinance, Section 2, a term which does not include the

United States.[23]  *See Wilson v. Omaha Tribe*, 442 U.S. 653, 667 (1979) (citation omitted) ("in

---

[22]     Plaintiffs refer variously to the Winooski "Comprehensive Plan," "Municipal
Development Plan" and "Municipal Plan."  Dkt. No. 47 at 33-34.  Neither Plaintiffs in their
extensive comments, AR12108 (FEIS E-477), nor Winooski city planners in correspondence
with the Air Force, *.e.g.,* AR52890, nor the Winooski City Council in its resolutions, *e.g.*
AR52982, ever mentioned  any form of Winooski "Municipal Plan."  Because none of the
Plaintiffs presented the Air Force with a claim regarding a Winooski planning document during
the administrative process, any argument regarding that document has been waived.  *Pub.*
*Citizen,* 541 U.S. at 764-65; *see also Martin v. Fed. Energy Regulatory Comm'n*, 199 F.3d 1370,
1373 (D.C. Cir. 2000) ("The [agency] points out, dispositively, that no inconsistency with any
state or local plans was raised before it[.]").  In any event, because the Winooski plan that
Plaintiffs cite to provides only "housing goal[s]," Dkt. No. 47 at 34, our discussion of the South
Burlington Comprehensive Plan applies to the Winooski plan as well.

[23]     The City of South Burlington defined "Person" to "mean any natural person, corporation,
municipality, the state of Vermont, or any department, agency or subdivision of the state, and any

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND**
**IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 31**

common usage, the term person does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it.").

Basing the F-35A at Burlington is not inconsistent with the South Burlington Comprehensive Plan.   A conflict exists with a local plan or law if the proposed action would be inconsistent with a specific requirement of that plan or law.   *See e.g.*, *Md-Nat'l Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1037 (D.C. Cir. 1973) (discussing federal "override" of local zoning procedures in siting a bulk mail facility).   There is no conflict with the Comprehensive Plan because it does not prohibit residential land use in areas subject to jet noise. Indeed, South Burlington's plan is not a proscriptive set of rules at all.   Instead, it provides "a framework and guide" which "states goals and objectives and recommends courses of action." AR19472.   The Plan itself stresses that its recommendations "are not mandates, but are suggestions to help guide the operations of the City and its citizens."[24]   *Id.*

Because the South Burlington Comprehensive Plan provides only "suggestions," there can be no conflict between the Plan and basing the F-35A at Burlington.   *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.* 524 F. Supp. 2d 642, 714 (D. Md. 2007) (explaining that there can be no inconsistency with a plan that merely expresses preferences); *see also, Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175-76

_____

partnership, unincorporated association or other legal entity."   Public Nuisance Ordinance, Section 2.

[24]   Plaintiffs assert that the "South Burlington Planning Commission submitted a comment on the DEIS which argued that the noise impacts of the F-35A would *conflict* with the City's Comprehensive Plan with regard to adequate affordable housing, preserving existing neighborhoods, and other goals."   Dkt. No. 47 at 33 (emphasis added).   In fact, the comment did not identify any specific regulation, rule, or law that conflicts with basing the F-35A at Burlington.   *See* AR8397 (RDEIS E-1258).   Instead, the Planning Commission addressed the "goals" of the Comprehensive Plan.   *Id.*   Those goals are discussed below.

(10th Cir. 2002) (proposed highway is not inconsistent with local plan which "had shifted [its] priorities to mass transit"). This case is directly analogous to *Audubon Naturalist Society*. There, the Prince George's County Council objected to an EIS for failing to "reconcile the [proposed highway's] inconsistency with the Prince George's County land use plans" and asserted the highway could "not be squared with the goals and policies in the County's current General Plans." 524 F. Supp. 2d at 713-14. The court found that there was no conflict. It did so because there is a distinction between a "preference" such as a goal, and an inconsistency with a particular requirement: "[s]imply because a proposed highway is not preferred or is not specifically mentioned in a General Plan does not constitute an 'inconsistency' that NEPA requires to be explained in an EIS." *Id.* at 714.

In sum, there is no conflict between basing the F-35A at Burlington and any of the plans or laws cited by Plaintiffs. Accordingly, the Air Force had no obligation to attempt to reconcile its actions with Vermont's Act 250, the South Burlington Noise Ordinance or the South Burlington Comprehensive Plan. 40 C.F.R. § 1506.2(d); *Audubon Naturalist Society,* 524 F.Supp.2d at 714. To be sure, those laws and plans have "objectives." As we now discuss, the Air Force reasonably and adequately illustrated any "possible conflict" between its proposed action and the objectives of those laws and plans.

 

**B.    The Air Force Complied With 40 C.F.R. § 1502.16(c) Because it Reasonably Informed the Public and Decision-makers of Any Possible Conflict Between the Proposed Action and the Objectives of the South Burlington Comprehensive Plan and Vermont's Act 250.**

Plaintiffs identify the objectives of the South Burlington Comprehensive Plan as providing for housing, and in particular, affordable housing. Dkt. No. 47 at 33-34; *see also* AR8397 (RDEIS E-1258) (comment of South Burlington Planning Commission, discussing goals of Plan). According to Plaintiffs, Act 250 is also addressed to housing as it is intended to address high levels of noise in "residential areas and areas of frequent human use." Dkt. No. 47 at 36. The Air Force's discussion of local land uses satisfied 40 C.F.R. § 1502.16(c) because it provided a thorough discussion of the possible impacts of basing the F-35A on both housing in general and low income areas in particular.

The Air Force directly responded to the South Burlington Planning Commission's concern that bedding down the F-35A at Burlington "would create additional areas of incompatible land use, particularly residential land use." AR8527 (RDEIS LU-22). It explained that the EIS provides information necessary to identify areas with uses generally considered incompatible under federal guidelines. *Id*; *see also* AR8528 (RDEIS LU-23) (providing similar information in response to comment LU-5 that the proposed action is incompatible with local planning goals). The Air Force clarified that those guidelines are not the "standards" Plaintiffs suggest, Dkt. No. 47 at 36, but rather guidance which provides recommendations rather than mandates. Only local zoning commissions can actually designate areas as incompatible for a particular use. AR8522 (RDEIS GO-17); AR12870 (FEIS E-1239).

Nonetheless, the Air Force specifically examined the impact of noise on two activities that are central to the use of a residence: sleep and conversation. The Air Force quantified the impact of noise through metrics[25] measured at more than twenty sample sensitive

---

[25] Those metrics included noise exposure, speech interference, classroom speech interference, sleep disturbance and potential hearing loss. AR8537 (RDEIS NS-32); *see also* AR10650-60 (FEIS 2-34 – 2-44) (providing analysis).

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 34**

noise receptors (schools, residential areas, hospitals and places of worship), selected because they were located "potentially with[in] areas affected by aircraft noise of 65 dB DNL and greater." AR10650 (FEIS BR4-24); AR10657 (FEIS BR4-31, map showing receptor sites). Because the F-35A will not fly during environmental night (10pm-7am), it will not create any new disturbance to sleep. AR10660 (FEIS BR4-34). And despite the general increase in noise, effects on the ability to communicate indoors in the representative neighborhoods examined were negligible. *See* AR10660 (FEIS 2-44); *see also* AR10659 (FEIS 2-43, Table BR3.2-10).

The Air Force also specifically addressed the impact of its decision on low income housing. In response to a comment that basing the F-35A at Burlington would degrade or destroy low income neighborhoods, the Air Force explained that basing the F-35A would continue the existing disproportionate impacts on minority and low income persons and referred the reader to both the FEIS's discussion of impacts on low income populations and to its response to comments addressing "incompatible" residential land use. AR8518 (RDEIS EJ-13). The FEIS provided more detail, explaining that basing the F-35A at Burlington would more than double (to just over 1,000) the number of low income people affected by noise in excess of 65 (dB) and increase the percentage of the affected population that is low income. AR10709 (FEIS BR4-83).

The Air Force also looked at whether noise would undermine neighborhoods by causing people and businesses to leave the affected areas. The agency acknowledged that the change in noise brought by the F-35A could change residential and business behavior, but because those decisions are "based upon multiple variables where aircraft noise or lack of aircraft noise can be one of the variables," the Air Force found that what any particular business or individual might do is a matter of speculation. AR8566.

Commenters also raised concerns regarding the impact of the basing decision on public health and quality of life, which are presumably among the issues the South Burlington nuisance ordinance is intended to address. The Air Force responded to these concerns by "recognize[ing] that some individuals may feel that they have experienced a reduction in quality of life; however, impacts to quality of life are not possible to quantify, since any potential measurement would be based on a set of subjective experiences that are highly variable among individuals." AR12852 (FEIS E-1221); *see also* AR8544 RDEIS NS-39).

> C.     **The Air Force Reasonably and Adequately Explained How it Would Reconcile Basing the F-35A at Burlington With Any Possible Inconsistency With Local Land Use Plans and Laws.**

The South Burlington Planning Commission apparently understood the Air Force's discussion of impacts on local land use to adequately identify a possible conflict between basing the F-35A at Burlington and the South Burlington Comprehensive Plan's goal of "providing adequate affordable housing." AR8397 (RDEIS E-1258). Rather than asking for additional information or analysis, the Planning Commission sought "assurance that these neighborhoods [including affordable housing] will not be adversely impacted." *Id.*

The Air Force was not able to provide that assurance. As discussed above, increased noise is an unavoidable consequence of basing the F-35A at Burlington. The Air Force has already adopted measures to operate the F-35A with restrictions to help minimize the annoyance of the noise produced by the F-35A and has committed to an adaptive management plan that will evaluate noise once the F-35A is flying and reduce noise impacts where practical. It has also pledged to work with the City of Burlington and the airport authority to develop the City's Part 150 program, which may further mitigate noise impacts. These steps have informed the public of the extent to which the Air Force is presently capable of reconciling the noise

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 36**

impacts from basing the F-35A at Burlington with the goals and objectives of the local plans and laws cited by Plaintiffs.

In sum, the analysis the Air Force presented was more than adequate to allow the public and the decision-makers to understand possible conflicts between basing the F-35A and the objectives of local land use plans and laws. *Cf.* Dkt. No. 47 at 37. The Air Force fostered the twin aims of NEPA by taking a hard look at how noise may affect housing, and particularly low income housing, and informing the public of the possible consequences of its decision by addressing how noise will affect the use of housing and low income persons and addressing issues such as whether noise might cause residents and businesses to leave. Moreover, although not required to, the Air Force also explained how it intends to reconcile its proposed action to any possible conflicts with local land use laws and plans—by mitigating the noise as much as possible through operational controls and by working with the City of Burlington as it develops and implements its Part 150 program.

## IV.   THE AIR FORCE ADEQUATELY AND REASONABLY CONSIDERED IMPACTS ON HISTORIC PROPERTIES [COUNT FOUR].

Plaintiffs assert that the Air Force's discussion of historic and cultural resources was deficient because they claim the Air Force should have: (1) addressed potential impacts on the "intended use" of the historic properties, Dkt. No. 47 at 42; (2) identified specific historic properties, *id.* at 40; and (3) addressed the possibility that historic properties would be purchased and razed. *Id.* at 45. Each of these arguments is without merit.

NEPA does not require a federal agency to consider the impact that its actions may have on the use of historic properties, and therefore the Air Force properly focused its

analysis on potential impacts to the characteristics for which the properties were listed.[26]   No authority required the Air Force to identify individual historic properties and therefore the agency reasonably assessed impacts to historic districts rather than individual properties.  Finally, the possibility that historic properties would be razed did not need to be considered or discussed in the EIS because it was not reasonably foreseeable.

### A.   The Air Force Properly Discussed Historic Properties.

The Air Force's analysis of potential impacts on historic resources was developed in conjunction with analysis provided by the Vermont State Historic Preservation Office (SHPO) as the Air Force fulfilled its obligation under Section 106 of the National Historic Preservation Act ("NHPA") to examine potential adverse effects to properties listed on the National Register of Historic Places ("NRHP").[27]

After reviewing the DEIS, the SHPO wrote the Air Force and noted that the noise contour maps raised the possibility that historic districts and structures could be among the properties exposed to noise levels above 65 dB.  AR11453.  In order to "fully evaluate the potential effects of the proposed project on historic resources," the SHPO sought more detailed maps and additional information on the physical impacts to structures, and also asked whether the FEIS would address the potential that the FAA's "Part 150, Airport Noise Compatibility

---

[26]     Assuming *arguendo* that the Air Force was somehow required to evaluate the use of the historic properties as residences, as is explained below the Plaintiffs' arguments still fail because the impact of noise on residential dwellings was adequately addressed in the EIS and the Vermont State Historic Preservation Office ("SHPO") concluded that basing the F-35A at Burlington would have no effect on the use of historic properties.

[27]     Like NEPA, the NHPA is a procedural statute.  *See Abenaki Nation of Mississquoi,* 805 F. Supp. 234 at 250.  NHPA regulations call for the investigation of impacts to historic properties to be a collaborative effort between the SHPO and the action agency, *see* 36 C.F.R. § 800.2(c)(1)(i), and allows NHPA review to be done as part of the NEPA process.  36 C.F.R. § 800.8.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 38**

Planning" program would be used to purchase and remove historic homes within the 65 DB contour. *Id.*

   The Air Force, through the VTANG, first responded with a letter that included a CD with larger and more detailed noise contour maps and provided additional information about matters addressed in the DEIS. AR54377. That letter prompted an e-mail conversation between the VTANG's Environmental Manager and the SHPO's Historic Preservation Review Coordinator and then a follow-up letter from the VTANG. The e-mail discussed the Part 150 program at some length and explained the Air Force's limited role in the program:

> The NCP [the Part 150 Noise Compatibility Program] is strictly an airport and FAA run program, so while the Air Force and Air National Guard provide noise and operations data, we do not have a role in the selection or implementation of noise mitigation measures chosen for inclusion in the NCP.

AR54724.

   The e-mail exchange was followed by a Memorandum that "formally respond[ed]" to the SHPO's May 29, 2012 letter. AR58088. The letter summarized the prior email correspondence and provided additional information, including a discussion of the "revisions being made to the final EIS in response to your questions."[28] *Id.* The Memorandum also provided additional information regarding the Part 150 program. It explained that the Air Force expected the Airport to update its Part 150 NCP "over the next year or so," and that Airport personnel had informed the Air Force that they do not intend to propose the purchase of additional homes for demolition under the updated NCP. AR58089.

---

[28] The Air Force subsequently decided that newly available census information warranted a Revised Draft EIS to better specify the noise impacts on local populations. As a result, the changes discussed in the email appeared first in the RDEIS rather than the FEIS.

The Revised Draft EIS followed in May of 2013. It included a completely revised discussion of the impact noise would have on historic structures. That discussion specifically disclosed that portions of two National Register of Historic Places-listed sites, the Winooski Falls Mill District and the Winooski Falls Mill Historic District (boundary increase) would be exposed to noise levels of 65 dB DNL or more. AR8807 (RDEIS BR4-62). The RDEIS also included an expanded appendix which addressed the potential for noise to impact historic structures in greater detail. AR7113-14 (RDEIS BR-49 - BR-50).

The RDEIS included the SHPO's letter as a comment, AR7981, and the highlights of the Air Force's memorandum were included as responses to comments. *See* AR8514-15 (RDEIS CR-9 - CR-10); AR8527 (RDEIS LU-22) (responses to SHPO letter).[29] Those responses informed the public of a number of points. First, the Air Force affirmed it would be taking a holistic approach and looking at historic districts rather than individual properties.[30] *See* AR8514 (RDEIS CR-9) (addressing question of whether individual properties would be identified by referring to EIS discussion which focused on districts rather than properties). Second, the Air Force has neither plans, nor authority to purchase any homes. AR8527 (RDEIS LU-22), AR8515 (RDEIS CR-10). Further, if any properties were to be purchased, it would be

---

[29]   The RDEIS erred in one respect: it stated that the SHPO had verbally concurred with the Air Force's conclusion that there would be no adverse effect to historic resources. AR8758 (RDEIS BR4-13). The SHPO corrected that statement in a letter which informed the Air Force that the SHPO had reached a final determination only after reviewing the RDEIS. AR11446 (FEIS B-5). The larger scale maps made available by the Air Force allowed the SHPO to determine that in addition to the two Winooski Historic Districts identified in the RDEIS, five additional historic properties within Winooski would fall within the 65 dB DNL contour. AR11447 (FEIS B-6). The letter was included within an appendix to the FEIS so the public could be aware of the SHPO's finding. *Id.*

[30]   This point would be reiterated more directly in response to a comment on the FEIS. *See* AR12849 (FEIS E-1218).

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 40**

done through the Airport's NCP and any NHPA compliance would be done by the City of Burlington, the Airport, and the FAA as part of that program.  *See* AR8515 (RDEIS CR-10).

Plaintiffs acknowledge that after informing the Air Force it had evaluated both direct and indirect effects, including the introduction of audible effects, the SHPO "concluded that F-35 noise would not be adverse to the use of historic structures."  Dkt. 47 at 40.  As the SHPO explained:

> *The historic resources located under the airspace, however, are significant for their architectural and/or historic associations* and are located in developed urban areas. The presence of aircraft within the airspace over these areas is long established, and the proposed project will not introduce audible elements that are not already present. As such, the audible elements related to the undertaking will not diminish the integrity of historically significant features of resources located under the airspace.

AR11447 (FEIS B-6) (emphasis added).  Consequently, the SHPO advised the Air Force, that after reviewing the EIS it concluded "that there will be no adverse effects on historic resources as result of the proposed undertaking."  AR11448 (FEIS B-7).

### 1.   NEPA Does Not Require Evaluation of Impacts on the Use of Historic Properties.

"NEPA has no independent requirement that an agency examine, separate and apart from any environmental impacts, the impact that a federal action will have on historic properties."  *N. Idaho Cmty. Action Network v. U. S. Dep't of Transp.*, 545 F.3d 1147, 1156 (9th Cir. 2008) (per curiam).  Consequently, because the analysis of historic properties under NEPA is limited to environmental impacts, the Air Force had no obligation to consider impacts on the use of historic properties.[31]

---

[31]     This limitation on an agency's obligations under NEPA is entirely logical given that Congress crafted a statutory scheme which imposes specific requirements on an agency's consideration of impacts to historic properties.  *See* National Historic Preservation Act, 54 U.S.C. § 300101-300321.  Plaintiffs initially brought a claim under the NHPA, Dkt. No. 3 at 37, but subsequently abandoned that claim. Dkt. No. 42 at 1.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 41**

Plaintiffs attempt to avoid that limitation by relying on *Town of Grapevine v. U.S. Dep't of Transp.*, 17 F.3d 1502 (D.C. Cir. 1994) and arguing that the requirements of NEPA with respect to historic properties are the same as those under Section 4(f) of the Department of Transportation Act. *See* Dkt. 47 at 43 ("Under NEPA as under § 4(f), 'there is no reason . . . to believe that the use standard applicable to a private home is inapposite merely because the home is historic.'"). Section 4(f) is not at issue in this case and thus the question for the Court is whether NEPA and § 4(f) impose the same standard. They do not.

Unlike NEPA, § 4(f) "imposes a substantive mandate[:] It allows a federal project 'requiring the *use* of land of an historic site' to be approved only if '(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.'" *N. Idaho,* 545 F.3d at 1158 (internal citation omitted; quoting 49 U.S.C. § 303(c)) (emphasis added by the court).

Because §4(f) imposes a substantive requirement to address "use," the *Grapevine* court addressed whether "the FAA erred in determining that [an] airport project would not 'use' historic properties within the meaning of § 4(f) of the Department of Transportation (DOT) Act, 49 U.S.C. § 303(c)." *Grapevine,* 17 F.3d at 1503. "For purposes of § 4(f), noise that is inconsistent with a parcel of land's continuing to serve its recreational, refuge, or historical purpose is a 'use' of that land." *Grapevine,* 17 F.3d at 1507 (citing *Allison v. Dep't of Transp.*, 908 F.2d 1024, 1028 (D.C. Cir. 1990)). *Grapevine* and its application of the Transportation Act is not persuasive here because this case does not implicate § 4(f). Moreover, NEPA is a procedural statute requiring only that a federal agency "consider the *environmental* impact of [a] major federal action." *N. Idaho Cmty Action Network*, 545 F.3d at 1156. The Air Force satisfied

NEPA's mandate by considering and discussing the environmental impacts on historic properties from basing the F-35A at Burlington.

**2.**     **The Air Force Properly Focused its Analysis on the Characteristics Which Enabled the Properties to be Listed in the National Register.**

The Air Force's consideration of impacts to historic properties should also be affirmed because it was not arbitrary and capricious for the Air Force to focus its analysis on the impact of noise on the characteristics that enabled the affected properties to qualify for listing on the National Register. *Communities, Inc. v. Busey*, 956 F.2d 619, 624 (6th Cir. 1992). Here, the SHPO confirmed those qualities are the "architectural and/or historic associations" of the historic properties. AR11447.

Both the Air Force and the SHPO concluded that noise associated with aircraft overflights did not impact any of the characteristics that qualified these properties for inclusion on the National Register. *See* AR11447. The Air Force's focus on the characteristics that rendered the properties eligible for listing is not only consistent with the SHPO's analysis, but also entirely consistent with the requirements of the NHPA. *See* 36 C.F.R. § 800.5(a)(1) (explaining that adverse effects on historic properties are assessed in light of the "characteristics of a historic property that qualify the property for inclusion in the National Register[.]"). The Air Force's focus on the characteristics which qualified the properties for inclusion on the National Register was neither arbitrary nor capricious and therefore must be affirmed.

**3.**     **In Any Event, the Air Force Did Assess the Impact on Residential Use of Historic Properties.**

As Plaintiffs acknowledge, the SHPO concluded that basing the F-35A at Burlington would not negatively affect the use of historic properties. Dkt. No. 47 at 40. Given the SHPO's expertise on the subject of historic properties, the SHPO's concurrence with the Air

Force's finding of no adverse impact on historic properties should negate any inference that the

Air Force's conclusion was arbitrary and capricious. *See S. Utah Wilderness All. v. Norton,* 326

F. Supp. 2d 102, 115-16 (D.D.C. 2004) (If an agency finds no adverse effect and the SHPO

concurs the agency's responsibilities under the NHPA are fulfilled). Moreover, the Air Force's

analysis did examine the impact of noise on the use of residential properties. *See* Section III.B.,

*supra.* Sensitive receptor site 20, the intersection of Main Street and East Spring Road in

Winooski is just a few blocks north of the Winooski Falls Mill Historic District and thus

illustrates the noise impacts on residential properties within the Historic District. The EIS noted

that although the residential area surrounding site 20 moved from a DNL below 65dB under

baseline conditions to 68dB with the F-35A, AR10658 (FEIS 2-42), there was no increase in

sleep disturbance, AR10660 FEIS 2-44), and the level of speech interference decreased slightly.

AR10659 (FEIS 2-43). Further, the Air Force considered whether residents and business would

leave areas within the 65 dB contour and concluded that because of the large number of

variables, no sound prediction could be made. AR8566 (RDEIS SO-63).

### 4.    The Air Force was not obligated to individually identify historic properties.

Plaintiffs complain that the Air Force did not "identify the affected historic

residential properties," Dkt. No. 47 at 40, but they cite no authority that required the Air Force to

have done so. Further, Plaintiffs ignore the limited scope of NEPA review.

Under the rule of reason, a reviewing court's role is not to flyspeck an agency's

NEPA analysis looking for any bit of information the agency could have gathered but did not.

*See e.g., Fuel Safe Wash. v. FERC,* 389 F.3d 1313, 1323 (10th Cir. 2004); *Half Moon Bay*

*Fishermans' Mktg. Ass'n v. Carlucci,* 857 F.2d 505, 508 (9th Cir. 1988); *Theodore Roosevelt*

*Conservation P'ship,* 661 F.3d at 75. Consistent with that principle, the Second Circuit has

repeatedly declined to obligate an agency to develop information of "little or no utility." *See*

*Fund for Animals v. Kempthorne*, 538 F.3d 124, 137 (2d Cir. 2008); *Cty. of Suffolk*, 562 F.2d at

1379.

When commenters suggested the Air Force identify individual properties, the

agency responded by explaining that it was assessing impacts on the Historic Districts as a

whole. *See* AR8514 (RDEIS CR-9); AR12849 (FEIS E-1218). Identifying the specific

properties affected within each historic district would have little or no utility for two reasons.

First, the EIS's identification of the historic districts informed both the residents of those districts

and people and entities interested in historic preservation that buildings within those districts are

subject to noise in excess of 65dB.

Second, the nature of the decision facing the Air Force demonstrates the

information would have had little value. The Air Force was choosing between three different Air

National Guard locations. Identifying impacts to historic districts allowed the Air Force

decision-makers to understand that historic resources will be impacted by basing the F-35A at

Burlington and compare those impacts to the impacts on historic resources at the alternative

locations, if any. Identifying individual properties within those districts would not meaningfully

aid that comparison. In short, it was entirely consistent with the rule of reason for the Air Force

to identify historic districts rather than the individual properties within those districts because

identifying individual properties would not have added significant value to the Air Force's

analysis.

### 5.    The Air Force was not obligated to consider the impact of historic properties being purchased and demolished.

As set forth above, the purchase and demolition of properties in Winooski was not

reasonably foreseeable. *See* Section III.B., *supra*. That argument applies with equal or greater

vigor to the historic properties located in Winooski. Accordingly, the Air Force had no

obligation to assess the prospect that historic properties would be purchased and demolished.

## V.   "NO MILITARY AIRCRAFT" AT BURLINGTON AGS IS NEITHER THE PROPER NO ACTION ALTERNATIVE, NOR A REASONABLE ALTERNATIVE [COUNT FIVE]

Plaintiffs' Count Five argues that the Air Force violated NEPA by failing to

evaluate an alternative that anticipated the retirement of Burlington's current F-16s, and thus

included neither F-16s nor F-35As. Dkt. No. 47 at 49. According to Plaintiffs, this "no military

aircraft" alternative should have been the no action alternative, or was at least a reasonable

alternative that should have been considered in the FEIS.[32] *Id.* at 49-50; 51-53. Both arguments

fail. Both rest on unfounded speculation that had Burlington not been selected to host the F-35A,

the Air Force "expected" that there would have been no military aircraft at Burlington. *Cf.* Dkt.

No. 47 at 53. More importantly though, the Air Force properly used the *status quo*, *i.e.*,

continuation of the current flying mission, as the no action alternative for each base evaluated

and an alternative with no military aircraft at Burlington was not a reasonable alternative.

### A.   Plaintiffs' Speculation that the Air Force Expected the Potential Retirement of the F-16s to Result in No Military Aircraft Being Stationed at Burlington is Baseless.

Plaintiffs attempt to support their speculation with hearsay statements allegedly

made by the Commander of the VTANG and a City Council Member at a Burlington City

Council Meeting, and a PowerPoint presentation the VTANG made in 2010 at meetings with

---

[32]     Plaintiffs also note that they submitted a comment requesting an SEIS evaluating this no military aircraft alternative. Dkt. No. 47 at 44-48. As required by its regulations, the Air Force considered the request. The agency dismissed the request because, as is discussed below, a no military aircraft alternative was not the proper no action alternative. *See* AR10450 (ROD 3) (noting comments were considered).

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 46**

elected officials and staff of the municipalities surrounding BIA and the news media.[33]  *Id*. at 47-
49.  Plaintiffs' speculation is baseless because Plaintiffs have conflated the fact that individual
aircraft have a finite service life with a decision to effectively close or radically repurpose the
VTANG—a logical leap that has no basis in the record.

   The VTANG's PowerPoint did inform those elected officials that the average
flight time on the F-16s at Burlington is approximately 5,650 hours, out of an original design
specification of 8,000 hours.  AR41201.   The VTANG explained that the Air Force's present
policy is to retire F-16s at 8,000 equivalent flight hours, AR41204, a threshold that Burlington's
F-16s are expected to reach in approximately 2018.  AR41212.   However, conspicuously absent
from the VTANG's presentation was *any* suggestion that once those aircraft were retired the
VTANG would abandon its decades old mission of flying fighter jets.  *See* AR41186-220
(PowerPoint).

   In any event, the Air Force directly addressed public comments asking what might
happen to Burlington AGS if it was not selected to host the F-35A.  The Air Force's response
was clear: "if there is no F-35A operational beddown at Burlington AGS *the current mission
would continue."*  AR8552 (RDEIS at PA-47) (emphasis added).  As the name implies, the
mission of the VTANG's 158th Fighter Wing is to fly fighter aircraft.  *See id* ("The beddown of
the F-35A at Burlington AGS would represent a continuation of the 158 [Fighter Wing]'s current
mission. . .").

---

[33] The PowerPoint was presented to civic leaders of South Burlington, Burlington,
Williston, Winooski, Essex, Essex Junction and Colchester and members of the news media. *See*
AR41128, AR41053, AR41182-83.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND
IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 47**

**B.      The Air Force Properly Identified the No Action Alternative as Continuation of the Present Operations.**

An EIS must "[i]nclude the alternative of no action," regardless of whether that alternative will meet the agency's purposes.  40 C.F.R. 1502.14(d).  A no action alternative is required because it allows agencies to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining the *status quo*.  In other words, *the current level of activity is used as a benchmark.*"  *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1269 (10th Cir. 2014) (quoting *Custer Cty. Action Ass'n v. Garvey,* 256 F.3d 1024 (10th Cir. 2001)) (emphasis added).

Here the proposed action being evaluated by the Air Force was to beddown and operate F-35A aircraft.  AR10508-09 (FEIS 1-6 - 1-7).  At each base considered, the Air Force defined the baseline or "no action" alternative as a continuation of the *status quo,* the operation of the aircraft presently at the base.  AR10572 (FEIS 3-2); AR10629-30 (FEIS BR4-3 - BR4-4, Burlington); AR10848 (FEIS JX4-4, Jacksonville); AR10938 (FEIS MC4-4, McEntire).  The Air Force's use of the *status quo* as the no action alternative must be affirmed because it is consistent with both CEQ guidance on NEPA and well established case law.

As Plaintiffs acknowledge, the CEQ's Forty Most Asked Questions guidance paper "explains that 'no action' means 'no change from the current management direction' and 'continuing with the present course of action *until that action is changed.*'"  Dkt. No. 47 at 49. (quoting *Mem. to Agencies Containing Answers to Forty Most Asked Questions to CEQ's NEPA Regulations,* 46 Fed. Reg. 18,026, 18027 (Mar. 23, 1981)) (emphasis added).  This guidance

instructs that the *status quo* is the appropriate no action alternative, and continues to be so until there is an affirmative decision to change the present course of action.[34]

In any event, court after court has recognized that the "*status quo*" is an appropriate no action alternative. *See e.g.*, *Ctr. for Biological Diversity v. U.S. Dep't. of Interior*, 623 F.3d 633, 642 (9th Cir. 2010); *Custer Cty*, 256 F.3d at 1040.  Indeed, courts have found agencies violate NEPA when their no action alternative does not accurately represent the *status quo*.  *E.g.*, *Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1247 (W.D. Wash. 2009).  Here, the Air Force made it clear in its response to comments that it expected Burlington to continue to fly military aircraft if it was not selected to host the F-35A.  AR8552 (RDEIS PA-47).  Therefore, without more, Plaintiffs' argument should be rejected because there is no question that the *status quo* at Burlington was the operation of F-16 aircraft analyzed in the EIS.

Plaintiffs nonetheless argue that the Air Force should have examined a "no action alternative" including "the absence of F-16s *and* F-35s" because the Air Force's NEPA regulations require the agency to assess "predictable actions" resulting from no action.  Dkt. 47 at 49-50 (citing 32 C.F.R. § 989.8(d)) (emphasis in original).   The Air Force's comments in adopting its regulations provide some insight as to what is properly considered a "predictable action" requiring incorporation into the no action alternative.  The comments note that in some circumstances the "existing environment" may include "expected future conditions as well as existing conditions."  *Envtl. Impact Analysis Process*, 64 Fed. Reg. 38,127, 38,127-28 (July 15, 1999).  But because the decision-making context is critical, the Air Force explained that it "prefers that those performing the analysis apply judgment about this on a case-by-case basis,

---

[34]     Indeed, NEPA serves to provide a framework through which an agency can evaluate a proposed action and decide whether to change the *status quo*.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 49**

*taking into account the nature and context of the proposed action.*"   *Id.* at 38,128 (emphasis added).

Here the proposed action was to find a home for the F-35A, not consider all possible basing permutations at Burlington.[35]  Further, while the F-16s currently assigned to Burlington are approaching the end of their service life, what might have happened when those aircraft reach the end of their service life is a matter of pure speculation.  As an Air Force basing official observed in an e-mail, "not replacing the Burlington F-16's with F-35s means that at some point in the future, something else will happen.  We just don't know yet what it is." AR64410.  Many F-16s are being retrofitted to extend their service life, AR63556, and "integrating the F-35 into the Air Force fleet is leading to a massive redistribution of F-16s throughout the fleet, including active, National Guard and reserve locations." AR59247.  Had the Air Force not decided to base the F-35A at Burlington, the present F-16s could well have been replaced with other F-16s.[36]  But as the Air Force basing official observed, had the F-35A not been selected to replace the F-16s, there could have been "any number" of reasonable alternatives available to the Air Force on how to configure Burlington. AR64410.

---

[35]   Given the limited purpose of its action, the Air Force did not address the subsequent redistribution of the aircraft that would be displaced by the F-35A.  Rather, the EIS simply informed the public that those aircraft "would be either reassigned *or retired* by the Air Force." AR4972 (DEIS at 2-3) (emphasis added).

[36]   Plaintiffs' reference to an EIS done by the Marines for the basing of the F-35B on the East Coast is inappropriate and misplaced.  It is inappropriate because that EIS is not in the Administrative Record and Plaintiffs never provided it during the NEPA process.  It is misplaced because, in that case, all of the Marines' present aircraft were being replaced *and the operational squadrons flying those aircraft were being deactivated.*  Marines FEIS at 1-2, 2-1, & 2-17.  Thus, for the Marines, and unlike the Air Force here, a "no military aircraft" alternative was both "authorized [and] reasonably expected."  *Cf.* Dkt. No. 47 at 50 (quoting Final U.S. Marine Corps East Coast F-35 Basing Decision Environmental Impact Statement (Oct. 2010)).  The Marine Corps FEIS is available at http://www.mcieast.marines.mil/JointStrikeFighterBasing.aspx (last visited February 24, 2016.)

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 50**

### C.   No Military Aircraft at Burlington Was Not a Reasonable Alternative.

"Under NEPA, an agency's discussion of alternatives to the proposed action forms the heart of the environmental impact statement." *NRDC v. FAA*, 564 F.3d at 556 (internal quotation marks and citations omitted). But like every obligation under NEPA, an agency's duty to examine alternatives is bounded by the rule of reason. An agency need not consider every conceivable alternative. Rather, the agency need evaluate only "reasonable alternatives."[37] *Id.*; *Senville*, 327 F. Supp. 2d at 347.

It is well established that an "alternative is unreasonable if it does not fulfill the purpose of the project." *Mayo Found. v. Surface Transp. Bd.*, 472 F.3d 545, 550 (8th Cir. 2006) (quotation marks and citations omitted); *see also e.g., NRDC v. F.A.A.*, 564 F.3d at 568-69 (FAA did not act arbitrarily in excluding alternatives that did not meet its purposes and needs); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011). This rule is an application of common sense. As the Ninth Circuit and other courts have explained, "[w]hen the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which

---

[37]     Plaintiffs suggest a "viable but unexamined alternative renders [the] environmental impact statement inadequate." Dkt. No. 47 at 51-52 (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999)). No court outside of the Ninth Circuit has ever applied "viable" as the standard. That is not surprising because it is inconsistent with the bedrock rule of reason and the NEPA regulations which expressly require only consideration of reasonable alternatives, *i.e. those that meet the agency's purpose and need.*   40 C.F.R. § 1502.14(a). It appears that the Ninth Circuit cases rotely repeating the statement that an unexamined viable alternative renders an EIS inadequate use "viable" as a synonym for reasonable. *See Ctr. for Sierra Nevada Conservation v U.S. Forest Service,* 832 F. Supp. 2d 1138, 1157 (E.D. Cal. 2011). Even so, the Ninth Circuit cases with more nuanced discussion make it clear that an alternative must be both viable *and* reasonable before it requires discussion. *See e.g., Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1059 (9th Cir. 2011) (agency violated NEPA "[b]y failing to examine a viable and reasonable alternative"); *Nw. Coal. for Alternatives to Pesticides v. Lyng,* 844 F.2d 588, 592 (9th Cir. 1988) ("[I]t is the scope of the program that influences any determination of what alternatives are viable and reasonable.").

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 51**

another thing might be achieved." *E.g.*, *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) (per curiam); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991).

Here the purpose and need of the Air Force's decision was to identify the appropriate military bases for the beddown of the Air Force's new F-35A aircraft.  AR10503. An alternative without military aircraft at Burlington would not meet that need and thus the Air Force had no obligation to consider it.  *NRDC v. F.A.A.*, 564 F.3d at 568-69.  In sum, even assuming *arguendo* there was some basis for Plaintiffs' speculation regarding the Air Force's intentions for the F-16s presently at Burlington, Plaintiffs' Count Five cannot succeed because the Air Force properly defined the no action alternative as a continuation of the present *status quo* and in any event, an alternative without military aircraft at Burlington would not have served the purpose of the proposed action and therefore need not have been evaluated.

## VI.   THE AIR FORCE ADEQUATELY AND REASONABLY ADDRESSED AIRCRAFT SAFETY AND PROPERLY CONCLUDED AN SEIS WAS NOT NECESSARY [COUNTS SIX AND NINE].

The essence of Plaintiffs' Counts Six and Nine is a complaint that the "FEIS contains no disclosure that the crash of an F-35A would present any hazards significantly different from the crash of an F-16."  Dkt. 47 at 63.  Plaintiffs requested that the Air Force prepare a Supplemental Environmental Impact Statement (SEIS) addressing alleged hazards associated with the F-35A's use of composite and low observable (or "stealth") technologies. The Air Force convened a number of experts in both hazardous material science and emergency response and concluded that the risks associated with the F-35A were not significantly different than the baseline, *i.e.*, the risks associated with the F-16.  One of the Air Force's experts summarized:

> The potential hazards to firemen, policemen, first responders, and civilians at the site of and downwind from an F-35 accident site are not expected to be substantially different than any other fire that involves advanced composite materials including F-16s and commercial aircraft currently serving the Burlington Airport.

AR65428.   As is shown below, Plaintiffs' claim fails because the Air Force has the right to rely on the reasonable opinions of its experts.

The Air Force taken great strides to ensure the safety of the F-35A.  Safety measures include "a robust safety clearance" including extensive flight-testing, AR10599 (FEIS 3-29); an engine safety program building on the lessons learned from thirty years of engineering, AR10678 (FEIS BR4-52); and extensive simulator training for pilots including "all facets of flight operations and comprehensive emergency procedures." AR10678 (FEIS BR4-52).  Not surprisingly though, aircraft safety was a concern of some members of the public.  AR10642. The FEIS thoroughly addressed the potential for F-35A mishaps and concluded that the risk was little different than that posed by the F-16:  the F-35A is expected to have a "long-term Class A accident rate comparable to that of the similarly sized F-16 aircraft." AR10677 (FEIS BR4-51).

As part of its analysis, the Air Force provided annual Class A mishap rates for each year since the introduction of the F-16 (first flown in 1975) into the Air Force inventory.[38] AR10598 (FEIS 3-28).  However, in order "to provide a broader perspective," the Air Force also discussed the mishap rate for the F-22A, an aircraft that has "similar flight capabilities" to the F-35A and like the F-35A "is a new airframe." AR10677 (FEIS BR4-51).

As the FEIS explained, a Class A mishap is *not* a crash.  Instead, Class A mishaps include any incident resulting in property damage of at least $2 million.  AR10597 (FEIS 3-27).

---

[38]     The table also included the mishap rate for the F-15, an aircraft of similar vintage which operates at other bases being considered to host the F-35A.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 53**

Plaintiffs acknowledge this, Dkt. No. 47 at 55, but nonetheless take the *mishap* rate, re-label it a "*crash* rate," and then imply that a crash is likely to occur at Burlington "by the end of the third year." *Id.* That claim is not only misleading but also baseless.

The VTANG has an excellent record of proper aircraft maintenance and pilot training, which are the hallmarks of accident prevention. *See* AR10677 (FEIS BR4-51); *see also* AR65842 (VTANG Class A mishap rate with the F-16 is roughly one-quarter of that "across the entire USAF inventory."). The last Class A mishap at Burlington occurred more than *fifty* years ago.[39] AR10676 (FEIS BR4-50). Moreover, as the FEIS explains, "technological advances have continually driven down the engine failure rate and associated aircraft mishaps."[40] *Id.*

Like most Air Force combat aircraft introduced since the late 1980s, the F-35A is made with significant quantities of advanced carbon composite materials[41] and utilizes low observable coatings. The DEIS noted these features as a benefit of the aircraft, AR4961 (DEIS 1-6), AR4987 (DEIS 2-18), and explained that the Air Force is moving toward "an almost all-stealth fighter force by 2025." AR4959 (DEIS 1-2).

Because *any* crash of a fighter aircraft would involve thousands of gallons of highly combustible jet fuel and be a potentially catastrophic event, *see* AR63819, AR43671, and even conventional metal aircraft present significant inhalation risks, AR43671, the FEIS did not

---

[39]    Almost 25 years ago, in 1992, a VTANG F-16 was involved in a Class A mishap in New Jersey. AR10676 (FEIS BR4-50).

[40]    The F-35A takes full advantage of those advances. For instance, its engines include a dedicated system safety program with a risk level that was more stringent than F-16 engines. AR10678 (FEIS BR4-52).

[41]    "Advanced" composites are not unique to the military. Rather, all carbon matrix composites are referred to as "advanced" to distinguish them from first generation composite materials such as fiberglass. Commercial airliners, automobiles, bicycles and many household items are made with advanced composites. *See* AR65430.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 54**

distinguish the potential impact of an F-35A crash from that of the F-16 presently flying at Burlington.[42]  *See* AR63819 ("All aircraft crashes, much less all fighter crashes, require a HAZMAT response.").

In September 2013, the same month the FEIS was published and long after the comment period had closed, Mr. Pierre Sprey,[43] along with Burlington City Councilor Rosanne Greco, authored a memorandum that asserts "the dangers from a F-35A crash are far greater than the dangers from a F-16 crash."  Dkt. No. 47 at 55 (quoting Greco-Sprey memo at 1).  Shortly thereafter, Plaintiffs' counsel submitted a letter formally requesting that the Air Force produce a Supplemental Environmental Impact Statement addressing the health hazards associated with the use of composite and stealth materials, and the preparedness of firefighters at the Burlington airport to respond to an F-35A crash.  AR63748-49.

As will be discussed in detail below, after conferring with its experts in environment, safety, occupational health, and emergency response fields, the Air Force prepared a Memorandum For Record (MFR) which briefly summarized the findings of those experts.  The MFR recorded the Air Force's conclusion:

> We do not consider Mr. Dumont's comments to present significant new circumstances or information relevant to environmental concerns based on the hypothetical scenario of an F-35 crashing in the Burlington area; and therefore the Air Force does not feel that Final EIS supplementation is required.

AR65351.

---

[42]      In at least one respect, an F-35A crash is less dangerous than that of an F-16 because the F-35A does not carry hydrazine (an explosive toxic chemical), while the F-16 does.  AR62957-58.

[43]      Mr. Sprey is a long ago Special Assistant to the Assistant Secretary of Defense for Systems Analysis, turned "ardent critic" of the Air Force and the F-35A in particular.  *See* AR63892 (quoting www.flightglobal.com).

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 55**

Plaintiffs now dismiss the Air Force's conclusions as "conclusory statements" and present a number of alleged "facts" drawn from the Greco-Sprey memorandum that improperly invite this Court to second guess the Air Force's conclusion.  Plaintiffs also allege the Air Force lacked information necessary to respond to the request for an SEIS and that the Air Force was obligated to publicly disclose the analysis it produced in responding to Plaintiffs' request for an SEIS.  None of these allegations have merit.

### A. The Air Force Took a Hard Look at Whether Supplementing the FEIS Was Necessary and Its Decision not to Supplement the EIS Was Not Arbitrary or Capricious.

If, after preparing an EIS, an agency is presented with "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," the agency must prepare an SEIS.  *E.g., Grand View*, 947 F.2d at 657 (quoting 40 C.F.R. §1502.9(c)).  In the Second Circuit, an agency's decision not to prepare an SEIS is reviewed in two steps.  First, this Court must ask whether the agency took a "hard look" at the information presented.   Second, the Court asks if the agency's decision, based on what it learned, was arbitrary or capricious.  *NRDC. v. F.A.A.*, 564 F.3d at 561 (citing *Grand View*, 947 F.2d at 657).  An agency's decision must be affirmed where the agency "has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information."  *See Marsh*, 490 U.S. at 378.

*Marsh* is the seminal decision on when an SEIS is necessary and provides important guidance here.  In that case the Corps of Engineers received a memorandum from biologists at a state wildlife agency that contended that the dam proposed by the Corps would have a greater impact on fish than the Corps' EIS had concluded.  The Corps addressed that contention in an internal memorandum which "explained why the concern was exaggerated."

490 U.S. at 381. The Supreme Court's decision turned on a point no less important here: "[w]hen specialists express conflicting views, an agency must have the discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378. Thus the Supreme Court affirmed the Corps decision because the Corps had taken "a hard look at the proffered evidence" and its experts had determined "that the new information was of exaggerated importance[.]" *Id.* at 385.

The Air Force responded to Mr. Dumont's request for an SEIS just as the Corps had in *Marsh,* by turning to its experts. Lieutenant Colonel (Lt. Col.) Victor Caravello, the Air Force's then Director of Occupational Health Policy, led the agency's "hard look" at whether Plaintiffs had presented significant new information requiring an SEIS."[44] AR64280-81. Lt. Col. Caravello assembled information from a variety of sources and produced a five page paper addressing Mr. Dumont's letter. His e-mail conveying the paper made an important point: although the F-35A has a substantially greater quantity of composite materials than the F-16s presently stationed at BIA, the "training and tactics" for emergency response remain the same. AR64454. He also explained that many commercial aircraft use advanced composite materials and that the health risks associated with those materials had been extensively researched. *Id.*

---

[44]      Plaintiffs suggest that the Air Force relied on Lt. Col. Caravello to avoid having to "award a contract to conduct additional analysis." Dkt. No. 47 at 59. That is wrong. Plaintiffs' quotation from the record omits a critical statement: "If you are seeking an authoritative source for analysis *in addition to Lt Col Caravello's,* our only alternative is to award a contract to conduct additional analysis." Read in context, the email conveys that Lt. Col. Caravello was the authoritative voice and questions why an additional source would be needed. AR65412. Further, subsequent emails show that comment was based on a misunderstanding. The author of the e-mail was not looking for an authoritative source on the hazards of composites; rather, he was looking for information relating to the administrative record, which Lt. Col. Caravello had no involvement in. *See* AR65411.

Lt. Col. Caravello's experience, review and consultation with other experts in the Air Force allowed him to draw a number of conclusions that were presented in his paper. Those are summarized as follows:[45]

> Both advanced composite materials and low observable or stealth materials have been in use for over 20 years and the F-16s presently flying at BIA include advanced composite materials. AR65427.

> Numerous research projects have addressed crash response and the associated health risks. There is no data to suggest that the general public would be at risk outside of the cordoned area of an accident site.[46] *Id.*

> The potential hazards to first responders and civilians at the site and downwind of it are not expected to be substantially different for the F-35A from any other fire that involves advanced composite materials including that of an F-16 or commercial airliners presently flying at Burlington. Nor does the presence of stealth materials require following procedures not already required for a fire burning advanced composite materials.[47] AR65428.

> Toxic gases released from a burning F-35A at an accident site are not expected to be substantially different from any other fire that burns composite materials. *Id.*

> Composites are found in many building materials, commercial aircraft, automobiles, recreational vehicles and marine vessels. Information is readily available for first responders regarding working in potentially hazardous environments, including when composite materials are burned at an incident site. AR65430.

---

[45]  Lt. Col. Caravello's conclusions are presented in block format for readability. The blocks of text are paraphrases rather than exact quotes.

[46]  The size of the cordoned off area would be determined by first responders to the site. That there would be risk at the immediate site of an F-35A accident does not distinguish it from any other aircraft accident site. *See* AR65427 (an F-35A "accident site could present a high potential risk to anyone at the site, *as would any accident site.*") (emphasis added).

[47]  Plaintiffs cite to Lt. Col. Caravello's observation that "various metals and low observable coating material pose significant health risks in terms of toxic gases (including carcinogenic materials)" while divorcing that statement from its context. *See* Dkt. No. 47 at 58 (citing AR65428). The next sentence informed: "Although these risks are significant, they do not necessarily require any special procedures not being followed for advanced composite materials."

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 58**

The Air Force provides free training to first responders.[48]  AR65428; *see also* AR64452 (describing training).

While the Air Force considered Lt. Col. Caravello to have a "great professional background" to assess the hazards related to composites, AR65432, his particular area of expertise is in occupational health (the potential hazards from working with composite materials), not in emergency response.  As a result, the Air Force also gathered input from its experts on crash response in general and BIA's preparedness in particular.  *See* AR65402-03.

Randy Caratachea, Chief of Fire Emergency Services for Air Combat Command, summarized the view of the Air Force's emergency response experts: "necessary current procedures are in place to properly deal with associated hazards with composite materials in general and the F-35A specifically.  *The aircraft does not present new or unique challenges for first/emergency responders which we do not already face.*"[49]  AR65402 (emphasis added).

---

[48]     Plaintiffs suggest this Court should infer that the training materials made available to first responders omit training needed to respond to stealth materials because "the composition of stealth coatings is classified information." Dkt. No. 47 at 62-63.  To be sure, the Air Force does limit the distribution of sensitive information about the content of advanced technology, but it makes the information available to first responders through mutual aid agreements which include access to Technical Orders distributed through a secure website. AR65383, AR64321.  The Air Force validated the fact that local fire departments have mutual aid agreements in place with Burlington, (AR65503) and that those fire departments receive updated information about emergency response procedures, including response to composite aircraft mishaps. AR65382; *see also* AR10543 and AR65726 (committing the Air Force to share information on F-35A crash response procedures with local fire departments and include that information in on-going training).

[49]     Plaintiffs' assumptions questioning the preparedness of the local fire fighters are unwarranted.  Plaintiffs' memorandum first contends it is "highly unlikely" that the VTANG's fire fighters are properly prepared to fight a fire from an F-35A. Dkt. No. 47 at 58.  Apparently realizing their error, Plaintiffs then concede the VTANG is fully prepared, but contend other area fire-fighters are not.  *Id.* at 59 (quoting AR64455 "It's unlikely mutual aid partners are fully trained on responding to incidents with composite material *but would have to verify with local fire chief*") (emphasis added).  A later e-mail from Air Combat Command's Chief Fire Officer contradicted that assumption by explaining that "local joint training programs ensure our local municipality counterparts are up to date and current." AR65382.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 59**

Having heard from its stable of subject-matter experts, the Air Force concluded that the risks associated with the use of composite and low observable materials in the F-35A did not constitute significant new information and therefore no Supplemental EIS was necessary. AR65351.  Because the Air Force has the "discretion to rely on the reasonable opinions of its own qualified experts," *Marsh,* 490 U.S. at 378, and took a hard look at the issue, it was not "arbitrary and capricious" for the Air Force to determine the "new" information did not warrant a supplemental EIS.  Indeed, because consideration of the risks of an aircraft crash "requires a high level of technical expertise," [this Court] must defer to the informed discretion of the responsible federal agencies." *Id.* at 377 (internal punctuation and citation omitted).

Because an agency is entrusted with the ability to rely on the opinions of its own experts, courts have stressed that NEPA does not provide a forum for "battles of the experts." *See e.g.*, *NRDC v. F.A.A.*, 564 F.3d at 561; *Envtl. Def. v. U.S. EPA,* 369 F.3d 193, 204 (2d Cir. 2004).  Despite that, Plaintiffs attempt to dismiss the Air Force's conclusions and invite this Court to second-guess the agency's conclusions by presenting – as alleged "facts" – a number of assertions drawn from the Greco-Sprey memorandum.  Accordingly Defendants briefly discuss those contentions to show that they are an improper invitation for this Court to referee a battle of experts, as well as unfounded.

Plaintiffs suggest that composites are so hazardous that the FAA has banned them from the interiors of commercial airliners.  Dkt. No. 47 at 56.  That is not correct.  The Air Force explained that composites have been used in aircraft "for over twenty years." AR64449.  That use includes the interiors of aircraft.[50]

---

[50]     *See h*ttp://www.compositesworld.com/articles/composites-in-aircraft-interiors-2012-2022 ("for many commercial aircraft, the weight of composite interiors significantly exceeds the weight of composite airframe structures"); *see also* www.fire.tc.faa.gov/research/backgrnd.stm

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 60**

Plaintiffs similarly repeat the unsubstantiated allegations of the Greco-Sprey document that neighborhoods "miles away from the crash zone" would be exposed to "potentially lethal concentrations of toxic gases." Dkt. No. 47 at 56. Studies by the Air Force and other federal agencies have found otherwise. For instance, Plaintiffs discuss the Air Force's Impact Analysis done after a B-2A crash but omit a critical conclusion of that analysis: sampling of the air, using NIOSH methods, both downwind of the crash site and at the site found no health dangers. *See* Impact Analysis at H-93 (cited in AR62583 and included in Defendant's Appendix); *see also* AR65428 (discussing FAA study).

Plaintiffs also rely on the Greco-Sprey memorandum to claim that a crash of an F-35A would somehow be unique in "releas[ing] toxic fibers and fumes" and that fighting a fire involving advanced composites require "unprecedented quantities of foam, plus specialized personal protection," Dkt. No. 47 at 58, 56. It is true that an F-35A crash resulting in fire will release toxic fibers and fumes and that responders to fires involving advanced composites utilize foam and specialized personal protection, but those points are also true of a crash of any fighter plane or large commercial aircraft that results in fire.[51] See AR43671 ("If a fire was involved [in an aircraft crash] toxic substances will be released"). All major aircraft crashes pose significant

---

("Thermoset composites form about eighty to ninety percent of the interior furnishings in today's commercial aircraft.")

[51]     Lt. Col. Caravello specifically addressed the risks from toxic gases and advised that "[r]esearch has documented the health risks and outlined the personal protective equipment needed and tactics for firefighting. This data has been circulating for over 10 years and first responders would need to know this information for responding to an F-16 accident, commercial airline accident or an F-35 accident." Further, while Lt. Col. Caravello did note that "composites and LO material bring new risks," the context is critical. Lt. Col. Caravello was discussing the risks associated with *maintenance* of the aircraft, not a crash. *See* AR64280 (". . . we are still trying to get a grasp of the *health hazards associated with the maintenance* of F-35s.") (emphasis added). Maintenance presents different risks than a response to a crash because maintenance personnel have long term exposure to hazardous materials.

hazards. *See id.* ("Aircraft crash sites are littered with numerous potential hazards"). Aircraft without composites still include structural alloys such as beryllium, aluminum, zinc, hydrazine, magnesium, titanium and copper that can be released in the form of metallic oxides, which pose an inhalation hazard to unprotected responders.[52] *Id.* Because all major aircraft crashes are hazardous, they are all fought in essentially the same way: by applying foam, which traps the inhalable material and smothers out the fire. *See* AR63819 ("All aircraft crashes, much less all fighter crashes, require a HAZMAT response.").

**B.    The Air Force Had the Information Necessary to Assess the Potential Risks of the Composite and Stealth Materials in the F-35A.**

Plaintiffs' allegation that the Air Force experts lacked access to information needed to address the risks of an F-35A crash is without merit. *Cf.* Dkt. No. 47 at 59 (citing AR64280). Lt. Col. Caravello, who led the Air Force's response, did observe that some information regarding the F-35A program was classified, but he never stated that information contained "crash data." AR64280. From that observation Plaintiffs leap to the unwarranted conclusion that Lt. Col. Caravello was unable to obtain information he needed, ignoring Lt Col Caravello's statement in the very same email that the crash data he had, and that he provided, was "current and correct." *Id.* Lt. Col. Caravello's observation regarding classified data was related to "the health hazards associated with the maintenance of F-35s," which he did not need to respond to whether the F-35A presents crash risks that significantly differ from those associated with the F-16.[53] *Id.* Several days later Lt. Col. Caravello produced his memorandum

---

[52]    Even seemingly benign materials can produce hazardous byproducts when burned. *See* AR43673-74 (listing hazard byproducts produced when materials used in the F-117 are burned).

[53]    In Dkt. No. 30 at 14, n.14, Defendant represented that Lt. Col. Caravello had Air Force personnel who were "read in" confirm his conclusions. That representation was based on Counsel's misunderstanding of information provided by the Air Force. Counsel has since

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 62**

thoroughly evaluating Mr. Dumont's claims.  AR64474.  Neither the memorandum nor any other document suggest that Lt. Col. Caravello was unable to obtain information he needed to address Mr. Dumont's letter.

### C.    The Air Force Properly Relied on an Internal Analysis to Respond to Plaintiffs' Request for a SEIS.

Plaintiffs claim the Air Force's response to Mr. Dumont's request for an SEIS was deficient because the information in Lt. Col. Caravello's memorandum was not included in the EIS.  Dkt. No. 47 at 66.  Plaintiffs' argument fails for two independent reasons.

First, though both composite and stealth materials have been in use since the 1980s and the DEIS disclosed that the F-35A was made with those materials, *e.g.,* AR4961 (DEIS 1-6).  Plaintiffs did not claim that this alleged "new information" required an SEIS until long after the close of the public comment period.  A potential plaintiff has an obligation to structure its participation to allow a meaningful response by the agency.  *See e.g., Pub. Citizen,* 541 U.S. at 764.  Having raised its allegation that the construction of the F-35A constituted significant "new information" long after the close of the public comment period, Plaintiffs should not be heard to claim the Air Force needed to provide a public response to their allegation.  *Id.*

Second, multiple courts, including the Supreme Court in *Marsh,* have expressly affirmed the use of an internal memorandum to address a request for an SEIS.  *See e.g., Marsh,* 490 U.S. at 383-85; *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.,* 42 F.3d 517, 529–30 (9th Cir.1994); *Vermonters,* 73 F. Supp. 3d at 430.  Indeed, if an agency's determination that no SEIS

---

learned from now Col. Caravello that he had no need for "read in" information to draw the conclusions provided in his memorandum.

was needed could be set aside simply because it relied on information not included in the EIS, no agency would ever be able to avoid doing an SEIS.

### D.     The Possibility of a National Defense Area Being Declared for an F-35A Crash Does Not Require an SEIS.

Plaintiffs also infer that the Air Force was obligated to disclose to the public, apparently through an SEIS, the risk of a National Defense Area (NDA) being declared. Dkt. No. 47 at 66-67. Lt. Col. Caravello's initial draft included a section he titled "Other thoughts," *i.e.*, thoughts not based on "concerns about composites," where he speculated that the general public may "not understand about a declared national defense area." AR64453. He added, however, that the information is already "somewhat available and has been previously broadcast on national news." *Id.* The reference to the possibility of an NDA being declared was omitted from his final memorandum. *See* AR65431. Lt. Col Caravello's off-hand comment that the public might not be aware that a fighter jet crash could result in the declaration of an NDA does not warrant a supplemental EIS.

Moreover, the possibility of an NDA was not significant new information. As the statute cited by Plaintiffs demonstrates, NDAs are declared to protect Department of Defense *property* (and that of NASA) including not only aircraft, but vessels, bases, posts, vehicles, equipment and "other property or places." 50 U.S.C. § 797(a) (cited in Dkt. No. 47 at 60). In other words, the possibility that an NDA might be declared after an F-35A crash was not new information because an F-16 crash would raise the possibility of an NDA just as that of an F-35A would.[54]

---

[54]     Even if the possibility of an NDA could be construed as new information, there is no way to assess its effects. Where an aircraft might crash and the nature of the crash are entirely matters of speculation. Further, whether an NDA would be declared and what it might look like turn entirely on the nature of the particular crash. *See* AR4366 (explaining how speed and angle

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 64**

In sum, in the FEIS the Air Force assessed the safety issues associated with an F-35A and concluded that they were not significantly different from those associated with the F-16. After receiving allegations that the F-35A presented unique hazards, the Air Force initiated a thorough analysis to determine whether the information presented in those allegations was accurate and constituted significant new information. After consulting with environment, safety, and occupational health experts and fire and safety response personnel, the Air Force concluded that the allegations were exaggerated and did not amount to significant new information. The record demonstrates that the Air Force was not arbitrary and capricious because it took the requisite hard look at whether an SEIS was required and properly relied on its own experts' opinions to conclude that it did not.

## VII.   THE AIR FORCE PROPERLY DISCLOSED THE FACTORS, INCLUDING COST, THAT WOULD BE USED IN ITS DECISION-MAKING [COUNT TEN]

Plaintiffs' Count Ten alleges the Air Force violated 40 C.F.R. § 1502.14 and 40 C.F.R. § 1502.23 because the Record of Decision (ROD) mentioned "overall cost," and in particular, the costs avoided through the retirement of Burlington's present F-16s, as part of the explanation of why Burlington was selected. Dkt. No. 47 at 73. Plaintiffs' argument fails because it misunderstands both the requirements of those regulations and the nature of the Air Force's decision.

40 C.F.R. § 1502.14, which addresses alternatives analysis, states that the agency "*should* present the environmental impacts of the proposal and the alternatives in comparative

---

of impact can affect distribution of crash debris). In short, any attempt to assess the impact of an NDA would be an exercise in rank speculation of little value to the decision-makers or the public. *See Cty of Suffolk*, 562 F.2d at 1378 ("If the additional information would at best amount to speculation as to [a] future event or events, it obviously would not be of much use as input in deciding whether to proceed.")).

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 65**

form" because doing so will "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." *Id*. (emphasis added). The Air Force did exactly that in each version of the EIS. Thus, as is shown below, Plaintiffs' reliance on 40 C.F.R. § 1502.14 is misplaced.

Plaintiff's reliance on 40 C.F.R § 1502.23 is likewise unhelpful to their claim. That section addresses an agency's "weighing of the merits and drawbacks of the various alternatives," including the potential use of "cost-benefit analysis." *Id*. The regulation instructs that an agency need not provide a "monetary cost-benefit analysis *and should not when there are important qualitative considerations*." *Id*. (emphasis added). Where, as here, no cost-benefit analysis was done, an EIS "*should* at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision." *Id*. (emphasis added).

From the beginning of the NEPA process, the Air Force identified cost as one relevant factor, but one of lesser importance than mission considerations. The DEIS explained that the Air Force considered four general factors in evaluating potential bases: "mission, capacity, environmental and cost," and tempered its consideration of those factors with the application of military judgment to "qualitative operational considerations." *See* AR4993-94 (DEIS 2-24 - 2-25). Importantly, the Air Force stressed that those factors were not weighted equally. Instead, the decision-making process "weighted mission criterion more heavily relative to the other three criteria of capacity, environmental and costs" in order to "emphasiz[e] the pre-eminent importance of mission accomplishment." AR4996 (DEIS 2-27).

Further, while Plaintiffs criticize the ROD for noting that the expected retirement of Burlington's F-16s would result in cost savings because those planes would not be reassigned

to another base, the DEIS also informed the public that existing aircraft at the candidate bases could be retired.  Other than at Mountain Home Air Force Base, the Air Force "propose[d] to drawdown (i.e., remove) all legacy aircraft from the selected bases as the F-35As become available."  Those aircraft "would either be reassigned *or retired* by the Air Force and replaced by F-35As."  AR4972 (DEIS 2-3) (emphasis added).

The pre-eminent weight given to mission accomplishment led to the selection of Burlington as the preferred alternative.  As the DEIS explained, Burlington "best fulfill[ed the] mission responsibilities, taking into consideration, technical, environmental and other factors."  AR4998 (DEIS 2-19).  Several comments on the DEIS asked for clarification of the Air Force's decision making.  The Air Force explained that the unavoidable environmental impacts of basing the F-35A would be weighed along with "other factors (for example *cost to implement* and available number of aircraft for basing options, governmental budget constraints, and political considerations)" but the decision would ultimately be driven by mission considerations.  AR8553 (RDEIS PA-48) (emphasis added).

Although all those "other factors" were part of the decision-making process, the four basic criteria outlined in the DEIS – and in particular, the pre-eminent importance of mission – continued to play the leading role.  *See* AR12864 (FEIS E-1233) (identifying those criteria as the "actual reasons" driving the basing decision).  The FEIS reiterated that Burlington was the Air Force's preferred alternative because it best fulfilled "mission responsibilities," while clarifying that the mission responsibilities were those "presented in the purpose and need."  AR10546 (FEIS 2-30).  The purpose presented in the FEIS generally spoke to broad ends such as "maintaining combat capability and mission readiness," but did call out one factor critical to that end: training.  AR10508 (FEIS 1-6).  The FEIS's discussion of "need" identified the key factors

necessary "to organize, equip, train, and support" the F-35A: "compatible base infrastructure" and "ready access to existing airspace suitable for the F-35A." AR10509 (FEIS 1-7).

The ROD then announced that Burlington had been selected. The ROD did not identify "overall cost" as an over-riding factor. *Cf.* Dkt. No. 47 at 73. Rather, it emphasized that Burlington "presented the best mix of infrastructure, airspace and overall cost to the Air Force." AR12882 (ROD 2). The ROD then elaborated on each of those factors, as well as others. As noted above, the ROD explained that "overall cost" included costs the agency was able to avoid because the F-16s presently at Burlington will be retired. The ROD also elaborated on the mission factors: "Burlington's airspace and ranges can support projected F-35A training requirements and offers exceptional joint and coalition training opportunities" with other U.S. and Canadian forces. AR12882-83 (ROD 2-3). As the ROD explained, Burlington's airspace was the only candidate base with "access to large overland airspace that allows training in all missions with large formations." AR64216 (ROD ¶ 5). Additionally, Burlington "offers exceptional joint and coalition training opportunities." AR10449-50 (ROD 2-3); *see also* AR64217.

## A.     The Air Force Complied with 40 C.F.R. § 1502.14.

Plaintiffs argue that the Air Force's discussion of the *economic costs* associated with basing the F-35A at Burlington did not comply with 40 C.F.R. § 1502.14 because it did not "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." Dkt. No. 47 at 73 (quoting 40 C.F.R. § 1502.14, internal punctuation in original). Plaintiffs' argument misses a critical point: the language from the regulation Plaintiffs rely on applies on to the presentation of "environmental impacts." An

agency's discussion of costs and other factors which may be considered in addition to environmental impacts is subject to 40 C.F.R. § 1502.23, discussed in the following section.

Consistent with its limited scope, 40 C.F.R. § 1502.14 provides explicit direction on how an agency is to provide "a clear basis for choice among options by the decisionmaker and the public[:]" an EIS "should present the *environmental impacts* of the proposal and the alternatives in comparative form[.]" 40 C.F.R. § 1502.14 (emphasis added). That is exactly what the Air Force did. In fact, Plaintiffs cite to comparative tables in the FEIS to support their statement that the "FEIS demonstrated that selection of the Burlington site would cause substantially greater environmental harm than the alternative sites." Dkt. No. 47 at 68 (citing *e.g.*, FEIS 2-31). Because the FEIS and the record as a whole present a clear basis to compare the environmental impacts of basing the F-35A in Burlington with those of basing it in Jacksonville or McEntire, the Air Force met its obligation under 40 C.F.R. § 1502.14.

### B. The Air Force Complied With 40 C.F.R. § 1502.23 Because the FEIS Allowed for Fair Consideration of the Adverse Environmental Effects of Basing the F-35A at Burlington.

Plaintiffs suggest the FEIS was not in compliance with 40 C.F.R. § 1502.23 because the FEIS did not explicitly disclose that the agency intended to rely on "overall cost" in its decision-making. Dkt. No. 47 at 73. As explained above, 40 C.F.R. § 1502.23 applies to an agency's "weighing of the merits and drawbacks of the various alternatives." Plaintiffs suggest that the regulation *requires* a cost-benefit analysis to be included in the EIS. Dkt. 47 at 71. It does not. The regulation expressly provides that "the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis *and should not be when there are important qualitative considerations. Id.* (emphasis added); *see also Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 430 (4th Cir. 2012); *N.C. All. for Transp. Reform, Inc. v.*

*U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 692-93 (M.D.N.C. 2001).  Because the Air Force did not do a cost-benefit analysis, the regulation simply recommends that an EIS "at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision." 40 C.F.R. § 1502.23.  Here the Air Force consistently identified cost as a consideration and even explained that the "cost to implement" the basing would be a factor the agency considered in its decision-making.  AR8553 (RDEIS PA-48).

Despite that, Plaintiffs assert that the Air Force misled the public about the economic factors it would consider in its decision-making.  Dkt. No. 47 at 72 (citing *e.g., Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996)).  As the Fifth Circuit observed in an early case, NEPA "permits, at most, a narrowly focused, indirect review of the economic assumptions underlying a federal project."  *S. La. Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir. 1980).  NEPA does so only because misleading economic assumptions can upset the purposes of an EIS by distorting both the agency's and the public's evaluation of a project.  *Webster*, 685 F.3d at 430 (citing *Hughes River,* 81 F.3d at 446).  However, reviewing courts must "remain cognizant . . . that 'the weighing of a project's benefits with its costs lies at the core of an agency's discretion."  *Id*. (citing *Hughes River* 81 F.3d at 446).  Thus, courts review the economic assumptions underlying a project only to determine whether they "'were so distorted as to impair fair consideration' of the project's adverse environmental effects."  *Id*. (quoting *Hughes River*, 81 F.3d at 446 and *S. La. Envtl. Council, Inc,* 629 F.2d at 1011).

Because the over-arching goal of the regulation is to allow fair consideration of a project's environmental effects, courts have consistently chastised agencies that rely on inflated economic benefits to justify the selection of an alternative.  Indeed, cases cited by Plaintiffs are prime examples of this.  In *Sierra Club v. Sigler,* 695 F.2d 957 (5th Cir. 1983) the Fifth Circuit

found a Corps of Engineers' EIS deficient because the Corps had "trumpet[ed] the benefits" of an activity as a "selling point" of a project while ignoring the costs that accompanied that activity. In *Hughes River* the agency had contracted with a university to calculate the net recreational benefits of a proposed dam. The university instead calculated gross benefits, and the agency incorporated that number into its cost benefit analysis. The Fourth Circuit found that the agency's unattributed reliance on "inflated" gross benefits was "crucial" to the decision because without those benefits, the proposed dam was not economically feasible. *See Hughes River*, 81 F.3d at 447.

This case is readily distinguishable because economic considerations were not "crucial" to the Air Force's decision. Where economic considerations are less central to a decision, courts are more tolerant of even erroneous economic assessments. Thus in *N. Carolina Alliance for Transportation Reform, Inc. v. U.S. Department of Transportation*, the court distinguished *Hughes River* because economic benefits were not used to "justify the project" and "it appear[ed] that the cost-benefit analysis did not play a decisive role in the decision of whether to undertake the proposed project." 151 F. Supp. 2d at 693. Further, even though the court assumed the agency's cost-benefit analysis was wrong, it found that the error was of relatively minor significance and thus did not impair fair consideration of the project's adverse environmental effects. *See id.*

Here, there is no basis to conclude that the Air Force's discussion of costs precluded a fair consideration of the adverse environmental effects of basing the F-35A at Burlington. The Air Force complied with its obligations under 40 C.F.R. § 1502.23 and consistently identified "cost" as a factor "not related to environmental quality" that was "likely to be relevant and important to a decision." *E.g.*, AR4993 (DEIS 2-24). Plaintiffs complain that

the Air Force did not expressly inform the public that it intended to rely on "overall costs" (specifically the costs avoided because Burlington's F-16s will be retired rather than replaced), Dkt. No. 47 at 73, but "cost" is a broad term and in response to a comments the Air Force clarified that the "cost to implement" the basing would be a factor in its decision-making. AR8553 (RDEIS PA-48). Moreover, the Air Force expressly informed the public that the existing aircraft could be "replaced or retired."[55] *E.g.,* AR4972 (DEIS 2-3).

Even assuming there is a meaningful distinction between the "costs" the Air Force discussed in the EIS and the "overall costs" mentioned in the ROD, there still is no basis to conclude that the Air Force's consideration of costs distorted its consideration of the environmental consequences of its decision. From the beginning of the NEPA process, the Air Force informed the public that cost would not play a decisive role in the agency's decision-making. Instead, "important qualitative considerations"–mission requirements–would be the pre-eminent consideration. *E.g.*, AR4996 (DEIS 2-17). The FEIS followed suit and reiterated that Burlington was selected because it "best fulfill[ed] its mission responsibilities taking into consideration operational, technical, environmental, and other factors" and that of the four criteria identified in the EIS, "the mission criteria was weighed more heavily than capacity, environmental, and cost." AR12872 (FEIS E-1241); AR12864 (FEIS E-1233).

Not only was cost not the driver of the Air Force's decision, but again unlike *Hughes River,* the magnitude of the difference in "overall costs" between Burlington and

---

[55]   Plaintiffs suggest the Air Force's discussion of the bases' transition from their existing aircraft to the F-35A was misleading. Dkt. No. 47 at 69. It was not. As the DEIS advised the public could happen, the F-16s at Burlington will be retired rather than replaced. Moreover, the F-35A will supplant the retiring F-16s on a one-for-one basis so that the VTANG will continue to have eighteen operating aircraft.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 72**

McEntire, the environmentally preferred alternative, is relatively minor.  *See* AR65329 (providing a total cost of $3.7 million for Burlington and $4.7 million for McEntire).  Despite that, Plaintiffs contend the Air Force misled the public by identifying the relevant costs as the costs of construction "and then relying on previously undisclosed 'overall cost' to over-ride Burlington's higher cost of construction."  Dkt. No. 47 at 73.   But that claim rings hollow because costs were not an "over-riding" factor in the Air Force's decision-making and in any event there was little practical difference in overall costs.

In sum, the Air Force's discussion of the costs of basing the F-35A at Burlington allowed fair consideration of the adverse environmental impacts of doing so.  The agency disclosed that it would rely on cost as a factor and at no point did it suggest that costs would be the controlling factor in its decision.  To the contrary it consistently represented that its decision would give more weight to mission related considerations.  And, indeed, when the Air Force explained that Burlington was selected because it "presented the best mix of infrastructure, air space and overall cost," two of those three factors were mission related.  AR12882 (ROD 2).

### Conclusion

The Second Circuit has long recognized that an EIS "need not be exhaustive to the point of discussing all possible details bearing on the proposed action" and thus must be affirmed if it provides "sufficient information" to allow "a reasoned decision" and in particular "a reasoned choice between alternatives."  *Cty. of Suffolk*, 562 F.2d at 1375.  As shown above, the Air Force analyzed the environmental impacts of basing the F-35A in more than sufficient detail to allow a reasoned choice between the alternatives, including a proper no action alternative.  Consequently, Plaintiffs' attacks on the adequacy of the FEIS must be rejected.

**DEFENDANT'S MEM. IN OPP. TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE RECORD – Page 73**

In addition, Plaintiffs' claims that the Air Force's response to Mr. Dumont's request for an SEIS

was inadequate are also unfounded as the Air Force properly relied on the opinions of its own

experts.  In short, Plaintiffs' motion for judgment on the record must be denied and Defendant's

cross-motion for judgment granted.

DATED this 7th day of March, 2016.

Respectfully submitted,
ERIC S. MILLER
United States Attorney
NIKOLAS P. KEREST
Assistant United States Attorney

JOHN C. CRUDEN
Assistant Attorney General

  /s/David W. Gehlert
DAVID W. GEHLERT
U.S. Department of Justice
Environment & Natural Resources Division  Natural
Resources Section

Attorneys for Defendants

*Of Counsel*:
Gerald P. Kohns SAF/GCN
Associate General Counsel
Air Force Pentagon, Room 5E773
Washington, DC  20330-1740

Wm. Darrel Johnson
Cara M. Johnson
Environmental Litigation Attorney
1500 W. Perimeter Road, Suite 1500
Andrews Air Force Base, MD 20762

CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2016, the foregoing document was sent by electronic mail via ECF to the parties below:

James A. Dumont, Esq.
Law Office of James Dumont
15 Main Street
P.O. Box 229
Bristol, VT 05443-0229

Laura J. Hill-Eubanks, Esq.
2364 Route 12a
Northfield, VT 05683

Robert S. DiPalma, Esq.
Paul  Frank  &  Collins
PC 1 Church Street
P.O. Box 1307
Burlington, VT 05402-1307

Christopher D. Roy
Downs Rachlin Martin PLLC
199 Main Street
P.O. Box 190
Burlington, VT 05402-0190

   /s/David W. Gehlert
DAVID W. GEHLERT
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section